433 So.2d 334 (1983)
Berta Cruz Lopez LASSEIGNE, et al., Plaintiffs-Appellants,
v.
Dr. Eugene W. DAUTERIVE, et al., Defendants-Appellees.
No. 82-776.
Court of Appeal of Louisiana, Third Circuit.
May 25, 1983.
Rehearing Denied July 14, 1983.
*335 J. Michael Artigue, Lafayette, for plaintiffs-appellants.
Voorhies & Labbe, Marc W. Judice, Lafayette, McGlinchey, Stafford & Mintz, Mark Hauck, New Orleans, for defendants-appellees.
Before DOMENGEAUX, FORET and CUTRER, JJ.
CUTRER, Judge.
This matter was consolidated for trial and appeal with the case of Berta Cruz Lopez Lasseigne v. Dr. Eugene W. Dauterive, 433 So.2d 338 (La.App. 3rd Cir.1983), in which case we shall render a separate decision.
These appeals arise out of medical malpractice suits. Berta Lasseigne and her husband, Harry, brought suit against Dr. Eugene W. Dauterive and his liability insurer, Hartford Accident and Indemnity Company,[1] for the loss of a child when the fetus died during the last few hours of Berta's pregnancy. Dr. Dauterive was the attending physician during Berta's pregnancy and at the time of the death of the fetus.
In this jury trial, after the presentation of plaintiff's evidence, the defendants filed motions for directed verdict. The trial court granted the motions and dismissed the plaintiffs' suits. Plaintiffs appeal. We affirm.
The issues presented for determination are as follows:
(1) Whether the trial court erred in granting directed verdicts under the facts and circumstances presented; and
(2) Whether the doctrine of res ipsa loquitur would be applicable.
Berta Lasseigne consulted Dr. Dauterive in April 1978, at which time it was determined that she was pregnant. Dr. Dauterive specialized in obstetrics and gynecology. Berta continued to see Dr. Dauterive during her pregnancy which progressed in a normal manner during the ensuing months.
On November 26, 1978, Berta began having labor pains and she went to the Dauterive Hospital as she was instructed by her physician. She was admitted to the hospital where she was checked by the registered nurse on duty, Susan Bartling. This nurse testified that Berta's contractions at the time of admittance at 9:40 P.M. were irregular and that Berta had not dilated at that time. She called Dr. Dauterive and gave him the results and he ordered medication for rest and pain. Dr. Dauterive also ordered that Berta be placed upon a continuous monitoring system which would detect and record the heart beat of the fetus and the contractions of Berta.
According to the testimony of the nurses, Susan Bartling, Ada Breaux and Stephanie Fontenette, all of whom were called on cross examination by plaintiff, Berta's progress was checked approximately every 30 to 40 minutes during the night. The hospital records support this testimony.
At 3:00 A.M., Dr. Dauterive was at the hospital on another matter. At that time, however, he consulted with the nurse on duty and examined the chart to ascertain Berta's progress. He "looked in" on Berta at that time. He found that the labor of Berta did not indicate dialation. He returned to his home where he remained available by telephone in the event that the *336 dialation and contractions progressed to the point of nearing birth of the child.
At about 5:25 A.M., the nurse called Dr. Dauterive and reported the status of Berta which indicated some increase in medication but birth was not indicated at that time.
Dr. Dauterive arrived at the hospital at 8:30 A.M., November 27th. Upon checking the monitor chart, he found that the heart tones of the fetus had stopped between 7:30 A.M. and the time of his arrival, one hour later. The family was told of the situation. Berta was continued on medication and the still birth took place later that afternoon. The child was a normal size: 9 pounds 2 ounces.
Dr. Dauterive could detect no reason for the death of the fetus. He requested that Berta and Harry allow him to perform an autopsy. This was refused. He stated that the monitor recording did not reveal any fetal distress which would have indicated lack of oxygen supply. He also stated that the monitor recording was normal in all other respects; i.e., the fetus heart beats were normal up until the time the heart stopped. Dr. Dauterive stated that the only method of making a determination of the cause of death was by an autopsy which was refused in this case.
Berta, Harry and a sister-in-law were called to testify. Their testimony does not refute the testimony of the nurses and the hospital records except that they stated that the nurses did not check Berta as often as the records indicate. There is nothing in this testimony that indicates anything other than normal progress in the status of the fetus and the mother who was expecting the birth of her second child.
Under the provisions of LSA-R.S. 40:1299.41, et seq. Berta and Harry filed their claim which was presented to the medical review panel consisting of three physicians; Drs. Harry W. Bernard, Edward Haile and Nelson C. Boudreaux. Their opinion read as follows:
"The medical review panel met in the above captioned matter after due and proper notice to all parties. The written evidence was reviewed and after examination of the panel by both parties, the panel renders the following expert opinion:

"1

"The evidence does not support the conclusion that the defendant failed to meet the applicable standard of care as charged in the complaint.

"2

"The conduct complained of was not a factor of any resultant damages to plaintiffs.

"Opinion rendered this 17 day of December A.D.1980."
The consolidated suits were tried by a jury. The plaintiffs' presentation consisted of the hospital records, the testimony of the plaintiffs and a sister-in-law, and the cross examination testimony of Dr. Dauterive and the nurses from the Dauterive Hospital. No other physicians were called to testify.
At the close of plaintiffs' presentation, the trial court dismissed plaintiffs' suits by granting motions for directed verdict filed by the defendants.
The trial court reasoned, in part, as follows:
"[t]he Court is convinced that the burden established by Revised Statutes, Title nine, section twenty-seven ninety-four, particularly in relation to establishment of the applicable standard, and the proof of causation, has not been met, despite the very liberal attitude which the Court is required to take on the basis of the decisions in the area such as Campbell against Mouton, and Gunter against Plauche, and several others, that I have therefore determined to grant the motion for directed verdict filed by each defendant, and order the plaintiff's claim dismissed at plaintiff's cost. ...."
The plaintiffs contend that the trial court erred in granting the motions for directed verdict.

*337 DIRECTED VERDICT
The standard to be used in deciding whether a motion for directed verdict should be granted in a jury case has been established by this court in the cases of Campbell v. Mouton, 373 So.2d 237 (La.App. 3rd Cir.1979), and Guillory v. Buller, 398 So.2d 43 (La.App. 3rd Cir.1981). These cases set forth the standards as follows:
"On motions for directed verdict and for judgment notwithstanding the verdict, the Court should consider all of the evidence-not just that evidence which supports the non-mover's case-but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury."
Since Dr. Dauterive practiced medicine in the specialized area of obstetrics and gynecology, the plaintiffs had the burden of proving that Dr. Dauterive either lacked the degree of knowledge or skill ordinarily practiced by other doctors within his own specialty, or that he failed to use reasonable care and diligence, along with his best judgment in the application of his skills as a specialist. Ardoin v. Hartford Accident & Indemnity Company, 360 So.2d 1331 (La. 1978); LSA-R.S. 9:2794.
As we apply these principles to the plaintiffs' evidence we conclude that the trial court correctly granted the motions for directed verdict filed by the defendants.
As to Dr. Dauterive, he was the only physician who plaintiffs called to testify. Dr. Dauterive stated he had been practicing obstetrics and gynecology for 24 years in New Iberia. He stated that Berta's pregnancy proceeded normally. The hospitalization of Berta on November 26, 1978, was according to his instructions. The treatment, monitoring and medication were administered according to his usual practice in this type of case. Berta's progress through the night of November 26, and the day of November 27, was attended to as he instructed by the hospital nurses. The monitor recording indicates the normal heart beat of the fetus up until its sudden unexplainable demise between 7:30 and 8:30 A.M. on November 27. There is no evidence that Dr. Dauterive deviated from the standards set forth in Ardoin v. Hartford Accident & Indemnity Company, supra. On the contrary, the three physicians on the review panel found that the evidence does not support the conclusion that the defendant (Dr. Dauterive) failed to meet the applicable standard of care as charged in plaintiffs' complaint.
As to the hospital, there is no evidence, either in the hospital records or testimony, that indicate that there were any negligent acts or omissions which would support a malpractice claim against the hospital. The facts and inferences herein point so strongly and overwhelmingly in favor of Dr. Dauterive and the Dauterive Hospital that reasonable persons could not arrive at a contrary verdict in favor of the plaintiffs. Having arrived at this conclusion, we find that the trial court correctly granted the motions for directed verdict.

RES IPSA LOQUITUR
The plaintiffs contend that the doctrine of res ipsa loquitur is applicable and that the case should be remanded for trial on that basis.
"[T]he doctrine of res ipsa loquitur would be appropriate only if the body of proof establishes or suggests that the alleged negligence of the defendants excludes every other reasonable hypothesis as to the cause of plaintiff's problem. In other words, the rule applies when the facts shown suggest the negligence of the defendant as the most plausible explanation of the injury. Helms v. St. Paul Fire *338 & Marine Insurance Co., 289 So.2d 288 (La.App. 3rd Cir.1974)....."

Guillory v. Buller, 398 So.2d 43, 47 (La.App. 3rd Cir.1981).
In the case at hand, none of the facts suggest that the defendants' negligence was the cause of the death of the fetus. Dr. Dauterive testified that there were several reasons, other than any negligence, that could explain the death of the fetus. He stated that an autopsy would be the only answer to the cause of the death of the fetus. His request for an autopsy was refused by plaintiffs. He explained the possible causes of death of the fetus as follows:
"[T]here are other causes, and as I stated, someone is poor placental function. That is, the afterbirth is just not functioning like it ought to, and it's found to be in patients over two weeks past their due date. It's alsoMrs. Lasseigne was approximately six to seven days past her due date at that time. But once you get two weeks and over past the due date, this fetal hypoxia can occur. It's also found in patients who have chronic hypertension over a period of years. This hypertension contributes to scarring of the placenta, therefore there's not as much surface material for that placenta to exchange oxygen and get a good supply for the baby. And you will note that fetal distress as monitored will occur quite often in these cases. I had occasion, approximately one year ago, to deliver a stillbirth, which is another example. This was in the patient who had felt no movement for a day and a half. She came in, we checked in my office. I heard no fetal heart tones. And I told her at the time. We did get an autopsy on that patient. In that patient the pathologist, while looking at the baby closely, felt the baby looked perfectly all right. When he performed the autopsy, he found that in the heart there was a problem which he felt contributed to a defect in the way the conduction of the electrokym impulses to the heart was carried out. Through the heart. And it could result in what he felt was a sudden death in that particular baby. And the disease process was called endocardial fibroelastosis, which is a long term meaning the inside lining of the heart, which is normally of one type of tissue have been overgrown with a different type of tissue, and interfered with the electrokym impulses that normally passed through there."

No other medical evidence having been presented to the contrary, Dr. Dauterive's testimony clearly removes the case against Dr. Dauterive or the hospital from the realm of the doctrine of res ipsa loquitur.
After a complete review of the record, we conclude that the facts and circumstances fully support the trial judge's granting of the motions for a directed verdict filed by defendants.
For these reasons, the judgment of the trial court is hereby affirmed. Plaintiffs-Appellants are to pay all costs of this appeal.
AFFIRMED.
NOTES
[1] The plaintiffs and defendants are the same on both suits except that, in suit number 82-777, the Dauterive Hospital, Inc., was added as a defendant.