111 So.2d 781

Lovelace LANGLINAIS

v.

GEOPHYSICAL SERVICE, INC.

No. 43572.

April 27, 1959.

Rehearing Denied June 1, 1959.

Davidson, Méaux, Onebane & Donohoe, Lafayette, for defendant-appellant.

J. E. Kibbe, Marcus A. Broussard, Abbeville, Bailey & Mouton, Lafayette, for plaintiff-appellee.

HAMITER, Justice.

The defendant, Geophysical Service, Inc., is appealing from a judgment condemning it to pay to plaintiff, Lovelace Langlinais, the sum of $7,526.57 as damages sustained by a portion of his 1953 rice crop. Plaintiff has neither appealed nor answered defendant's appeal.

As a basis for the demand for damages the petition alleged that " * * * · on or about the 26th day of May, 1953, employees of said Geophysical Service, Inc., while carrying on geophysical operations on behalf of their said employer, and acting

within the course and scope of their said employment, entered upon petitioner's rice crop and exploded or caused to be exploded a charge or charges of dynamite, which was of such violence and force that it caused a portion of petitioner's levee, on the east side of his crop, to break and collapse; and that large quantities of water flowed from the marsh, through the aforesaid break in petitioner's levee, onto petitioner's rice crop."

In its answer the defendant, after denying that the referred to exploding dynamite charge was responsible for the damages suffered by plaintiff's rice crop, affirmatively averred that heavy and unusual rains caused water to rise and exert excessive pressure against the levee which, as a result of such pressure, ultimately gave way. It further alleged that its employees were in no manner negligent in their operations.

■ Plaintiff has been and is a tenant rice farmer of a tract of land located in Vermilion Parish that is owned by D. O. Guidry and the Green Estate. On the east side of the property is a drainage canal (the south end thereof connects with the Intercoastal Canal) which, at one time, often overflowed the adjacent lands. In the late spring of 1951 plaintiff caused a levee to be built along the west bank of such drainage canal (eastern edge of his rice field) for the purpose of protecting his crop from overflow during periods of high water. Thereafter this protection levee held firmly against the highest water of the canal.

On May 26, 1953, after the water in the drainage canal had receded somewhat from its peak and while plaintiff's rice crop of that year was approximately seven weeks old, employees of the defendant came onto the land in question to conduct seismographic tests (the defendant was operating as the agent of a mineral lessee, pursuant to an oil and gas lease granted by the landowners although a copy of it is not in the record, and with the permission of plaintiff); and between two-thirty and three o'clock p. m. of that day they set off a dynamite charge there, in a hole drilled to a depth of about fifty feet, at a spot referred to as "Shot Point No. 26". Later (within an hour and a half) one of plaintiff's farm hands discovered a break in the protection levee, extending from its top to its bottom and being twelve to fifteen feet wide, through which water from the drainage canal was entering the rice field and producing the damages for which payment is demanded herein.

In resisting the demand the defendant first argues, to quote from the brief of its counsel, that "plaintiff has utterly failed to establish that there is any causal connection between the explosion of Shot Point No. 26 and the break in the levee * * *." We do not agree. Plaintiff proved (and this is uncontradicted) that the protection

levee was approximately six feet high, eight to ten feet wide at the top, twenty feet wide at the bottom, and soundly constructed; and that, despite the unusually high water which existed in the drainage canal several days previous to the exploding of the dynamite charge, there had been no overflowing of the levee to cause its erosion. Also, it was shown that plaintiff, because of such excessive water, had kept the levee under daily surveillance. On this point some of his farm hands testified that they had walked the levee several times a day to inspect it, and that on no inspection trip prior to the explosion had they observed therein any weak places, leaks, breaks, or other defects. One of these witnesses (Eves Hargrove who was not working for plaintiff at the time of the trial) further stated that he was at the pumping station, located beside the Intercoastal Canal on the south side of the rice field, when he saw defendant's employees come onto the land during the day of May 26, 1953; and that he then walked from such station along the protection levee to Shot Point No. 26—a route which included the spot where the break later occurred.

On arriving at Shot Point No. 26, Hargrove, according to his testimony, watched the exploding of the dynamite charge which occurred there. Shortly thereafter he walked back to the pumping station (but not along the levee), some 3,000 feet away, where he noticed an unusual amount of water coming through a small ditch that served to drain off the rice field. Immediately he began walking the levee to inspect it, and eventually he came upon the break located approximately 2,300 feet from such station.

Other helpers of plaintiff testified that they were working about a quarter of a mile from the break (also approximately the same distance from Shot Point No. 26); that they heard the explosion and felt a distinct tremor resulting from it; and that thereafter they noticed a perceptible rise of water in the field and Hargrove's signalling them to come over to the levee. These witnesses could not fix definitely the time interval between the explosion and such signalling, but they estimated it variously as being between one hour and an hour and a half. On arriving at the break they, along with Hargrove, sought to repair the levee; but their efforts were of no avail because of the fast and strong flow of the water.

In view of the facts detailed above we can discern no reasonable explanation for the levee's collapse other than that it was caused by the explosion.

Of course, as before shown, the answer of the defendant contains affirmative averments that the disintegration resulted from abnormally heavy rainfall and too much water pressure against the levee. However, there is no satisfactory evidence in the record to substantiate them.

Too, the defendant makes much of the fact that the levee collapsed about 820 feet from Shot Point No. 26, whereas there was no like result at a location 275 feet from that point. This indicates, its counsel argue, that the levee was weak at the locus of the break. Perhaps it was weaker at some places than at others, and that some portions thereof could withstand explosion tremors while others could not. But protection levees near rice fields are not built to hold against the effects of dynamiting operations. They are constructed sufficiently large and strong to prevent the overflow of water from adjoining canals. Plaintiff's levee, as shown above, had satisfactorily served that purpose.

In seeking to uphold the award of damages herein counsel for plaintiff contend that the defendant is liable (1) by virtue of the absolute liability principle as enunciated and applied in Fontenot v. Magnolia Petroleum Company, 227 La. 866, 80 So.2d 845, and (2) because plaintiff has established gross negligence on the part of the defendant, and (3) because the doctrine of res ipsa loquitur is applicable and the defendant has not rebutted the inference of negligence which arises thereunder.

Countering these contentions, defense counsel say that (1) the Fontenot decision is not controlling here, it being predicated on the provisions of Revised Civil Code Article 667 which provides for absolute liability only as between adjoining landowners, and (2) gross negligence on the part of the defendant has not been proved by plaintiff, and (3) if res ipsa loquitur is applicable (which is denied) the defendant has "exculpated itself from any negligence and has overcome the burden of proof shifted to it by the application of the doctrine."

Pretermitting plaintiff's first and second contentions, we address ourselves to a consideration of the litigation in the light of the res ipsa loquitur doctrine.

As stated in the comparatively recent case of Northwestern Mutual Fire Association v. Allain, 226 La. 788, 77 So. 2d 395, 396, 49 A.L.R.2d 362, "* * * res ipsa loquitur is a rule of evidence, the applicability of which is to be determined in each case at the conclusion of the trial. When the doctrine of res ipsa loquitur is applicable to a case, the accident which has caused plaintiff's damage makes out a prima facie case of negligence on the part of the defendant, and the burden is then on the defendant to show absence of negligence on his part. * * *

"Cases involving injuries inflicted on the plaintiff by steam, electricity, fire, gas, complicated industrial machinery, and other dangerous instrumentalities furnish the clearest instances of the use of the doctrine of res ipsa loquitur. * * * It is well established in the Louisiana juris-

prudence that the doctrine of res ipsa loquitur must be applied to a case if the accident which damaged plaintiff was caused by an agency or instrumentality within the actual or constructive control of the defendant, if the accident is of a kind which ordinarily does not occur in the absence of negligence, and if the evidence as to the true explanation of the accident is more readily accessible to the defendant than to the plaintiff." See also Lykiardopoulo v. New Orleans & C. R., Light & Power Company, 127 La. 309, 53 So. 575, Hake v. Air Reduction Sales Company, 210 La. 810, 28 So.2d 441 and Plunkett v. United Electric Service, 214 La. 145, 36 So.2d 704, 3 A.L.R.2d 1437.

■ In the instant case all of the requisites for rendering the doctrine applicable are present. The instrumentality which directly caused plaintiff's damages, as we have found, was in the actual control of defendant's employees; the destructive event was of a kind, according to defendant's experts, which ordinarily does not occur in the absence of negligence; and, indisputably, evidence as to the true explanation of that event was and is more readily accessible to the defendant than to the plaintiff.

■ Accordingly, such doctrine being applicable here, we proceed to a determination of the question of whether the defendant has sustained the burden of overcoming the inference of negligence on its part.

The witnesses giving testimony as to the actual loading and shooting of the hole at Shot Point No. 26 were M. J. Carroll and J. W. Kuehn, respectively defendant's observer and shooter during the seismographic operations. The former stated that he was at the hole when it was loaded and 200 feet therefrom at the time the charge was exploded; the latter said that he supervised the loading and shooting; and both testified that the procedure employed was "standard and in no way varied from the usual and customary procedure required by Geophysical Service, Inc." Thus, the defendant, with reference to the issue of negligence, has merely offered evidence to show that its employees used reasonable care.

According to certain pronouncements contained in Northwestern Mutual Fire Association v. Allain, supra, such evidence is insufficient in a case of this nature. Therein, we said: "Upon analysis it is obvious that all that these defendants have done is offer evidence of reasonable care on their part. In discussing the value of this type of evidence in overcoming the inference of negligence in a res ipsa loquitur case Prosser has the following to say:

" 'But if the defendant merely offers evidence of his own acts and precautions amounting to reasonable care, it is seldom

that a verdict can be directed in his favor. The inference from the circumstances remains in the case to contradict his evidence. If he testifies that he used proper care to insulate his wires, to inspect his chandelier, to drive his bus, or to keep defunct mice and wandering insect life out of his bottled beverage, the fact that electricity escaped from the wires, that the chandelier fell, that the bus went into the ditch and the bug was in the bottle, with the background of common experience that such things do not usually happen if proper care is used, may permit reasonable men to find that his witnesses are not to be believed, that the precautions described were not sufficient to conform to the standard required or were not faithfully carried out, and that the whole truth has not been told.' Prosser, Handbook of the Law of Torts (1941), p. 309.

"It is also well established in the Louisiana jurisprudence that this type of evidence is not sufficient to overcome the inference of negligence in cases involving the doctrine of res ipsa loquitur. * * *"

Be that as it may it is extremely doubtful that reasonable care and all necessary precautionary steps were observed by the employees of this defendant, as they testified. According to defense experts the employment of appropriate measures in undertaking the shooting would render impossible the damaging of plaintiff's levee; yet it did occur. Again, notwithstanding that both Carroll and Kuehn testified that only a five-pound charge of dynamite was placed in the hole at Shot Point No. 26, at least one of the mentioned defense experts said that "our average shots are about twenty pounds." This would suggest that in shooting the marsh land involved here, which is more sensitive to tremors than most other types of soil, the shot used was heavier than five pounds and inappropriate. Furthermore, the testimony of the observer Carroll, that he was at Shot Point No. 26 when the loading took place and noticed that the standard procedure was followed, is flatly contradicted by that of his assistant (also a defense witness), one J. W. Harvey. The latter said that Carroll was with him at Shot Point No. 25—located 1,600 feet from the dynamite hole—when both the loading and the shooting occurred.

Our conclusion is that the defendant has not overcome the inference of its negligence arising under the res ipsa loquitur doctrine and that, therefore, it is liable for plaintiff's damages.

Since the defendant does not challenge the amount of the district court's award, and the plaintiff has neither appealed nor answered defendant's appeal, no question of quantum is presented for our consideration.

For the reasons assigned the judgment appealed from is affirmed at appellant's costs.