CHRIS T. BARNETTE, Judge pro tem.
This is a suit in subrogation brought by the plaintiff, insurer of the Winn-Dixie Stores, Inc., for damages arising out of a fire within the terms of the policy of insurance.
The warehouse of the Winn-Dixie Stores, Inc., was being enlarged, and during the course of construction it was necessary that a wall be entirely removed for the extension of the building. When the wall was removed, the merchandise of the insured was exposed to possible damage by the elements, and protective measures were taken by covering the merchandise with a plastic material of the polyethylene variety. Further precaution was taken by moving the stacked merchandise back from the exposed area some four or five feet.
During the course of construction which was under the general contract of the S. S. Jacobs Company, Inc., one of the defendants herein, sparks or bits of molten metal from a welder’s torch fell on the merchandise causing a fire resulting in a damage to the merchandise in the amount in excess of $30,000.00. The loss was adjusted after making allowance for salvage at $23,040.-02, which amount the plaintiff-appellee, Fireman’s Mutual Insurance Company, paid to its insured the Winn-Dixie Company, Inc. This amount of damage was agreed upon by stipulation.
The insurer has brought this suit in sub-rogation against S. S. Jacobs Company, Inc., the general contractor, and its insurer, the Fidelity and Casualty Company of New York, and the Sun Erection Company, Inc., and its insurer, the Aetna Casualty and Surety Company, for $23,040.02. The suit is one in tort based upon the alleged negligence of the general contractor and/or the subcontractor in causing the fire.
A separate suit was filed entitled Sun Erection Company, Inc., vs. S. S. Jacobs Company et al, arising out of the same accident and presenting the same issues. For the purpose of trial the cases were consolidated.
The defendant, S. S. Jacobs Company, Inc., prosecuted a cross or third party claim for indemnity against the subcontractor, Sun Erection Company, Inc., in the event it should be held liable to plaintiff. There was judgment in favor of the plaintiff for the full amount of its claim against the Sun Erection Company, Inc., and its insurer, the Aetna Casualty and Surety Company, and in favor of S. S. Jacobs Company, Inc., and its insurer, dismissing the demands of the plaintiff against them. The defendant, Sun Erection Company, Inc., and its insurer, Aetna Casualty and Surety Company, have appealed.
The fire in question occurred July 13, 1960. Suit was filed July 10, 1961, and trial concluded more than a year later. The long lapse of time between the fire and the trial no doubt had some bearing on the conflict of testimony.
The record before us reveals no serious question of law and no question of quantum *818 since the damage was stipulated at $23,040.-02, but merely the question of whose negligence caused the fire and resulting damage. Another question arises out of the alleged assumption of responsibility for any danger to its merchandise by the Winn-Dixie Company, Inc., and its failure to take adequate precautions against the possibility of fire, thus precluding recovery on account of its contributory negligence.
We have read and studied the transcript of testimony of the witnesses very carefully and find a great deal of contradiction relative to the welding or burning operations taking place, from which sparks or molten metal were caused to fall upon combustible merchandise below. It seems incredible that a fire of this magnitude could have been set off by sparks from a welder’s torch without some person from among the many witnesses being able, or willing, to identify positively the workman whose welding torch caused the fire. We cannot escape the conclusion that some of the witnesses testified falsely or withheld knowledge which should have been revealed. The trial judge was certainly in a better position to appraise their credibility than we are, and we will not disturb his judgment in the absence of apparent error.
We think the doctrine of res ipsa loquitur invoked by the plaintiff does have an application here. The instrumentality which caused the fire and resulting damage to plaintiff was a welding torch, the dangerous nature of which is too well known to admit of doubt. It was in actual control of an employee of a subcontractor and perhaps within the constructive control of the general contractor. The accident was not of a kind which ordinarily occurs in the absence of negligence. The defendant, in whose control the welding torch is, cannot escape liability merely by asserting his own exercise of reasonable care. This doctrine ably discussed in Langlinais v. Geophysical Service, Inc., 237 La. 585, 111 So.2d 781, we think is applicable here. Also see Northwestern Mutual Fire Association v. Allain, 226 La. 788, 77 So.2d 395, 49 A.L.R.2d 362, and authorities there cited.
The defendants seek to overcome the burden imposed upon them by the doctrine of res ipsa loquitur by the assertion that the insured, Winn-Dixie, through its agents and employees were negligent in failure to take necessary precautions against the hazard of fire and place a great stress on Winn-Dixie’s alleged assumption of risk and responsibility for protection of its merchandise. On this point a review of the testimony of certain key witnesses is in order.
John B. Cothran, ironwork foreman for Sun Erection Company, Inc., after testifying that for some days before the fire the stock of groceries had been moved to make room for the work to proceed and that in some places they were moved back ten to fifteen feet and then again would be shifted as necessary as the work proceeded, then testified beginning on page 154 of the transcript of testimony:
* * #
A. “Well, the day before the fire was the one closest to it. I went and talked to Mr. Credle, and he in turn told me to go see Ben White, the carpenter foreman down there.
Q. “What happened after that?
A. “Well, Ben White went to see Mr. Davis, and I went to see Mr. Davis.” [Warehouse superintendent for Winn-Dixie]
Q. “Will you relate the conversation that took place ?
A. “Mr. Davis told us he did not have any place to put the groceries. I told him that we were beginning to put the joists up and we were going to start tying the building in over there next morning, and asked him if he did not move the groceries, who was going to be responsible for them. Mr. Davis, in reply told me that they were his groceries and he would be re *819 sponsible for them. So, the groceries being covered with vis-queen, or this plastic material they call or say is ‘visqueen’, we went on and went to work.
Q. “The next morning, did you have occasion to see Mr. Davis?
A. “I did.
Q. “Were you accompanied by anybody then ?
A. “No, sir.
Q. “What conversation did you have with Mr. Davis at that time?
A. “I told him we were going to have to start to work on it that particular morning, and he told me the groceries were covered and they were moved back far enough, and to go ahead and do my work — and that is what I did.
Q. “Did he make any other comment about it ?
A. “Not that I recall, except that they were his groceries and he was responsible for them.”
* * *
On cross-examination: (tr. of testimony page 169)

A. “Because you are going to have sparks any time you ‘burn’ and ‘weld’.
Q. “Well, was the purpose of your asking Mr. Davis to move the groceries a realization on your part that welding at this point on the roof would create a fire hazard if the groceries were not moved?
A. “No, sir.
Q. “Well, what is your reference to ‘sparks’ of fire? What is the significance of that?
A. “I don’t understand 'you. Any time we work on a roof we carry tools in the building. You drop things, or if you are going to ‘weld’ or ‘burn’ there is ‘sparks’.
Q. “Why were you concerned about sparks ?
“Well, there were groceries there, Cap.
“In your mind, what might happen ? cO
“It’s clear — paper can catch on fire. >
“Then you were thinking about a fire hazard weren’t you ? a
“And other things. You could drop something that would go through a box. It was too much stuff there, and I wanted to get it out of the way for safety. >
“So you thought about getting it out of the way for the safety of your men, including the possibility that these sparks would set the toilet paper or some of the groceries on fire; is that correct? a
“Yes. >
“Did you tell that to Roy Davis? o
“Yes. I told him his groceries would be damaged. >
“Did you tell him how they might be damaged? a
A. “No, sir.
Q. “Did you say anything to him about possible fire hazard?
A. “No.
Q. “You just asked him to move the the groceries because you all were going to be working over there; is that right?
A. “Yes.
*820 Q. “And he said that he could not move them?
A. “He said that he did not have anyplace to move them.
Q. “So the effect of your conversation with him was that he was not going to move them, or that he could not move them; is that correct?
A- “Yes, sir.
■Q. “What did you do then?
A. “Well, he told me they were his groceries and he would take the responsibility of them; that he had them covered, and for us to go on and do the work. And that is exactly what I done.”

We think the above-quoted testimony is -particularly significant in that it dealt with 'hazards generally, such as dropping tools .as well as sparks, but no particular em-phasis was placed on the fire hazard. The -witness said (quoted above) that he did not Say anything about a possible fire hazard.
Ben F. White referred to in the above-■quoted testimony, carpenter foreman of the S. S. Jacobs Company, Inc., under the supervision of James A. Credle, construction ^superintendent, testified as follows:
=K * *
A. “ ‘Johnny B’ — Mr. Cothran is his last name I think — and I had come to see Roy Davis about moving the groceries (interrupted by)
-Q. “In what way were you contacted by John Cothran concerning moving these groceries?
N. “He came up to the front and told me that he had gone to see Mr. Credle about getting the groceries moved in the back and that Mr. Credle told him to come to see me; .■so him and I went over and saw Mr. Davis, and Mr. Davis told us he had a carload of groceries that came in the night before and he had no place to put them. In the course of the conversation — I don’t remember the exact words, but ‘Johnny B.’ Cothran, asked me if I would take the responsibility. I told him I could not possibly take that responsibility. So he asked Mr. Davis something to the effect of ‘Who in the hell is going to take the responsibility. I’m not going to do it’; and Mr. Davis said he would. In the further conversation, ‘Johnny B’ (Cothran) asked me what I thought, and I told him, ‘If Davis is taking the responsibility for it, go ahead and do the work — whatever he was supposed to do to get it done, that Mr. Credle wanted the job finished.’
“After a while, through further conversation, I asked Mr. Davis if there wasn’t some kind of way that he could possibly get them away to the other corner or something, and he again said ‘No’, that he could not do it. So then I asked him if he was going to take the responsibility for it, and he said T guess so’. To make sure that he took the responsibility for it, I then asked him to give me a note saying that he could not move the groceries; which he did, and I left and went back to the front.”
* * *
Robert Lee Pace (or Page), a foreman of Sun Erection Company, Inc., testified as follows: (tr. of testimony page 202)
* * *
Q. “What discussion did you have the day before the fire ?
A. “Well, I didn’t talk to Mr. Credle the day before the fire; I talked to him the morning of the fire.
*821 Q. “Did you have a discussion with anybody the day before the fire?
A. “With ‘J°bnny B’ — Mr. Cothran.
Q. “What was that conversation about ?
A. “It was concerning the groceries. He told me that they told him it was almost impossible to move the groceries because they had no place to put them.
Q. “What else?
A. “The morning of the fire I went to see Mr. Credle, and he told me to see Ben White and take it up with him; and Ben White and I went to see Winn-Dixie’s warehouse manager, Mr. Davis.
'Q. “You and Ben White went to see Mr. Davis?
A. “Yes. I took him in my pick-up and we went to the back and talked to Mr. Davis.
Q. “What happened then?
A. “I told him that Sun Erection Company would not be able to be responsible for the groceries, and Ben White told him the same— that he could not be held responsible ; and Mr. Davis stated that he would take the full responsibility for the groceries, that he had a train load or carload or something of groceries to come in and it was impossible to move them.
Q. “Did you require anything else?
A. “I told Mr. Davis that we would have to have it in black and white, and he wrote out a note and signed it and gave it to Ben White.
Q. “Did you see the note?
A. “Yes, sir. I stood there while he got the note; and I read it, and he signed it.
• Q. “Did you see him sign it?
A. “Yes, sir.
Q. “Did you read it?
A. “Yes.
Q. “What did the note state?”
* * *
A. “It stated that he would assume full responsibility for the groceries.
Q. “Responsibility for what? For moving them, or for not moving them, or for the damage?
A. “That he did not have any place to move them.
Q. “But what responsibility was he going to take?
A. “He said for anything that happened — the full responsibility.
Q. “You actually read this note, and saw him sign it?
A. “Yes, sir.
Q. “In any event, as I understand your testimony, he said the same thing verbally to you and Ben White; is that right?
A. “That’s right.”
* * *
The note which was alleged to have been written and given by Mr. Davis assuming responsibility was never produced in evidence and its disappearance has not been fully explained. The testimony of Roy M. Davis, warehouse superintendent of Winn-Dixie Company at the time of the fire, denied the foregoing conversations and also denied writing a note assuming responsibility. We think the testimony that Mr. Davis did assume responsibility as above related by the witnesses to be substantially true notwithstanding his denial. However, this assumption of risk and responsibility on his part could not be con *822 strued as a license' to the welders to proceed with a welding or burning operation admittedly dangerous and likely to cause a fire as testified above by Mr. Cothran until adequate precaution had been taken to protect against such probability better known to them, because of their experience in such matters, than to Mr. Davis. Even assuming that a great responsibility would rest upon the Winn-Dixie Company and its employees, the workmen engaged in welding or burning had an opportunity under the last clear chance doctrine to avoid the damage which to them was clearly foreseeable by their own testimony.
The jurisprudence of this state on this point is fully discussed in Eggleston v. Louisiana & A. Ry. Co., La.App., 192 So. 774, cited with approval in O’Connor v. Chicago, R. I. & P. Ry. Co., La.App., 40 So.2d 663.
The following statement of the law enunciated in those cases is applicable here (quoting from O’Connor, page 665) :
“ * * * The rule furnished by those authorities is that where a person negligently places himself in a perilous situation and his negligence and peril are actually discovered by the operator of the offending vehicle, or by the use of reasonable care should and could have been discovered, there is then a duty on the part of the operator to save that person from the consequences of the negligent act, if, by the exercise of due diligence, such can be done. If ’ said operator, after the actual or constructive discovery of the existing peril, could have prevented the occurrence of an accident by the exercise of due diligence and failed to do so, such failure constitutes negligence and is considered the proximate and immediate cause of the accident and resulting injury, and the person’s negligence the remote cause; and said person may recover, although his negligence continued to the moment of the accident.”
The degree of negligence is emphasized by the fact that two fires were set off by the welder’s torch and that after the first had been ignited employees of Winn-Dixie shouted an alarm to the welder. He moved over to another position and immediately set off the second fire. Whether he did not hear the shouts of alarm or ignored them we do not know, for the identity of the individual workman was never established and became a serious issue in the case. Hence no statement from him is known to-be in the record.
All the circumstances considered, and viewed in the light of the above-quoted testimony about moving the groceries to a safer place and assumption of risk, we see some indication of irritation and impatience, an attitude of willfulness or total unconcern for the consequences of an operation known to be extremely hazardous.
Prosser on Torts discusses assumption of risk by express agreement, as here claimed, and by implication from the conduct of the. parties. He says:
“If an express agreement exempting the defendant from liability for negligence is to be sustained, it must appear that its terms were brought home to-the plaintiff, and that the express terms, of the agreement apply to the particular negligence. In general, such agreements are not construed to cover the aggravated forms of negligence described as ‘wilful’ or ‘gross,’ or intentional misconduct.” Prosser on Torts, Second Edition, page 307.
Except for the issue discussed above, the trial below developed into a contest between the defendants, Jacobs and Sun Erection Company, and another subcontractor not a party to the suit, namely, the Anning-Johnson Company. This company was engaged to lay the roof decking over the bar joists installed by Sun Erection Company, Inc. That operation of necessity had to come after the bar joists had been securely fastened to the heavy structural *823 steel framework of the building. The roof decking consists of sheets of corrugated material welded onto the bar joists. Much •of the testimony in the trial court centered .around the question whether on the morning of the fire the welder whose torch set ■off the blaze was an employee of Sun Erection Company, Inc., “burning” loose bar joists where they had been temporarily '“tacked” to the I-beam, or an employee of Anning-Johnson “welding” roof decking •onto the bar joists. For the “burning” •operation welders usually wear goggles, but the “welding” operation requires the use of .a protective mask or hood.
Several witnesses stated that the workman whose torch set off the fire was ■wearing a welder’s mask or hood. This would tend to support the contention of Sun Erection Company, Inc., that he was a roof •decker employed by Anning-Johnson. "There is conflict also over the alleged "breakdown of Anning-Johnson’s welding •equipment, it having been testified that a •cable was broken and at the time of the fire Anning-Johnson could not have been engaged in welding. Over and against this testimony is that of Robert Lee Pace, general foreman of Sun Erection Company, Inc. He stated that Sun had two welding machines on the job, but that at the time of the fire the lead lines from one had been removed to make an extension to the lead line •of the other machine which was then in use in the cold storage room some distance from the fire. Here we have the irreconcilable •conflict of the two subcontractors, between whom the responsibility lies, each claiming that its welding machines were temporarily ■out of operation at the time of the fire.
It is difficult, if not impossible, for this Court to determine which of the witnesses is more worthy of belief. The evidence taken as a whole indicates very pointedly that the Sun Erection Company, Inc., was still in the process of “burning” the bar joists where they were attached to the supporting I-beam. This placed its employees directly above the spot where the droppings of molten metal set off the fire. Mr. Coth-ran, a Sun Erection Company, Inc., foreman, testified as quoted above that the day before the fire he had a discussion of safety precautions in anticipation of their working on the bar joists the next day.
While the testimony is conflicting and by no means conclusive beyond all doubt, we think it does preponderate against the Sun Erection Company, Inc. Unfortunately the trial was more than two years after the fire and the witnesses could have been honestly mistaken in such detail as whether a welder was wearing a mask or goggles. We find no manifest error in the findings of fact of the trial court in the absence of which its findings must be sustained.
The judgment appealed from is affirmed.
Affirmed.