474 So.2d 984 (1985)
William S. CULVER, Sr.
v.
OCHSNER FOUNDATION HOSPITAL, et al.
No. 85-CA-148.
Court of Appeal of Louisiana, Fifth Circuit.
July 29, 1985.
Writ Denied November 1, 1985.
*985 Oestreicher, Whalen & Hackett, David W. Oestreicher, II, New Orleans, for William S. Culver, plaintiff-appellant.
Adams & Reese, Henry B. Alsobrook, Jr., Donald C. Massey and C.F. Gay, Jr., New Orleans, for Ochsner Medical Foundation, Ochsner Clinic, Dr. Leos Veprek and Dr. W. Brooks Emory, defendants-appellees.
Before CHEHARDY, CURRAULT and DUFRESNE, Jr., JJ.
CHEHARDY, Judge.
William S. Culver instituted this suit for medical malpractice against Ochsner Foundation Hospital, Dr. Leos Veprek, and Dr. *986 William Brooks Emory in connection with a surgical procedure known as thoracentesis, performed by Dr. Veprek under the direction of Dr. Emory.[1] He alleges that catheter tubing which broke off during the procedure is the cause of his present health problems.
Following a trial by jury, judgment was rendered dismissing plaintiff's suit. Plaintiff has appealed.
The incident giving rise to these proceedings began on May 28, 1977 when plaintiff, a 62-year-old diabetic, was brought to the hospital emergency room with complaints of chest pain, chills and fever. By his own admission he was a very ill man. He was running a temperature of 103.2° and was far too ill for only emergency treatment. He was admitted to the hospital under the care of Dr. Emory, a specialist in the field of thoracic surgery.
During the period of his hospitalization, after many tests and x rays, it was determined that plaintiff was suffering from diabetes, on-going emphysema and staphylococcal pneumonia. Pneumonia is seldom seen in May and is usually associated with the winter months, and "staph" pneumonia is very rare at any time. Only 1% of pneumonia cases are due to staphylococcal bacteria, and 50% of the patients who have that type of pneumonia die from it.
Plaintiff had been a patient at Ochsner Clinic and hospital for many years. He had been a heavy smoker, averaging three to four packs of cigarettes per day for an extended period of time. He had also lost 30 pounds recently over a relatively short period without a change of diet or activity.
Plaintiff was carefully monitored from the time of his admission to the hospital, but the pneumonia in his right lower lung was gradually worsening and a large accumulation of fluid was noted in the pleura, the cavity between the lungs and the ribs. The fluid prevented the lung from working properly and Dr. Emory ordered Dr. Veprek to perform a thoracentesis. This procedure involves the insertion of a needle and/or a tube into the pleura to take fluid samples.
The thoracentesis was performed in plaintiff's hospital room by Dr. Veprek with the assistance of a nurse. Mrs. Culver, also a nurse, was present although she did not assist in the procedure. During this time a 6-inch piece of sterile catheter tubing, extremely narrow in width, sheared off and remained in plaintiff's chest cavity for 45 days when it was discovered by Dr. Paul DeCamp during another operation.
Following the removal of the fluid, which was taken by Dr. Veprek on June 3, 1977, plaintiff's condition improved and he was discharged from the hospital on June 30. He still had pneumonia but was well enough to return home and to continue his treatment thereafter with Dr. Emory on an outpatient basis.
On July 7, 1977 Mr. Culver returned to Dr. Emory with complaints of chest pain. He had a high fever, elevated blood sugar and white blood cell count. The doctor was concerned that the patient had cancer, and had him readmitted to the hospital. X rays of the lungs showed the pneumonia was getting worse in the right lower lung. A broncoscopy[2] was performed along with other tests, but not enough material was secured to be helpful in providing a diagnosis. A decision was then made to do an internal biopsy. This was performed by Dr. DeCamp, a thoracic surgeon.
Since cancer was suspected, a liver biopsy was performed first because if the cancer had spread to the liver it would have been considered out of control. There was no evidence of cancer in the liver so Dr. DeCamp then opened the chest and examined the lungs. No cancer was found but a large abscess was present in the pleura and on the lower right lobe the piece of catheter *987 was found protruding from the abscess. Because the lower portion of the lung was in such a diseased state the doctor removed that part of the lung, along with the abscess and the catheter. The tissue and the catheter were turned over to Dr. Leonard, the pathologist. The surgery which was performed by Dr. DeCamp on July 19, 1977 is known as a thoracotomy, and removal of the lung tissue as a lobectomy. Plaintiff was discharged on July 30. He was last seen by Drs. Emory and DeCamp on September 13, 1977. While plaintiff has returned to other doctors for other problems, he has never sought further medical attention for problems with his lungs.
Mr. Culver blames his present physical problems and the second operation on the catheter incident. It is his position that the catheter caused the abscess which necessitated the operation whereby the right lower lobe of his lung was removed. He and his family testified as to his activities prior to his operation and his present physical problems.
He now experiences shortness of breath, has a lack of stamina, and has lost the ability to perform carpentry and repair work around the house. He is unable to repair the family cars as he did before the hospitalization, and is unable to participate fully as a volunteer fireman, an activity he pursued vigorously and had enjoyed over the years. He was an active swimmer prior to the incident but has not tried to swim since his hospitalization. Plaintiff now confines his activities mostly to staying around the house. He also is unable to garden to the same extent that he had previously enjoyed.
Prior to the institution of a suit for medical malpractice plaintiff must cause a medical review panel to convene as provided by LSA-R.S. 40:1299.47. The panel convened at plaintiff's request found the evidence "did not support the conclusion that the defendants violated the standards of care for their specialties that is charged in the petition." Thereafter plaintiff instituted this suit for malpractice in the 24th Judicial District Court for the Parish of Jefferson.
The issues for our determination are whether or not any substandard professional conduct on the part of defendants has contributed to, or caused plaintiff's health problems after the thoracentesis procedure, and whether, as contended by plaintiff, the doctrine of res ipsa loquitur is applicable.
A medical specialist is required by LSA-C.C. arts. 2315 and 2316 and LSA-R.S. 9:2794 to exercise the degree of care and possess the degree of knowledge or skill ordinarily exercised and possessed by physicians within his medical speciality. Ardoin v. Hartford Acc. & Indem. Co., 360 So.2d 1331 (La.1978). Where the defendant practices a particular medical speciality the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians or dentists within the involved medical speciality.
Plaintiff must also prove defendant either lacked this degree of skill or failed to use reasonable care and diligence along with his best judgment in the application of that skill and that as a proximate cause of this lack of knowledge or skill, or the failure to exercise this degree of care, the plaintiff suffered injuries that would not otherwise have been incurred. R.S. 9:2794.
The act itself provides that this statute shall not apply where the doctrine of res ipsa loquitur is applicable. It is plaintiff's position that res ipsa loquitur is applicable here, and therefore the burden is on defendants to exculpate themselves from negligence.
In order for the doctrine to be applicable it must be shown that: (1) the accident is of a kind which does not normally occur in the absence of negligence; (2) the accident was caused by an instrumentality in the actual or constructive control of the defendant; and (3) the information as to the true cause of the accident was more readily available to the defendant than to the plaintiff. Guillory v. Buller, 398 So.2d 43 (La.App.3d Cir.1981); Wells v. Woman's Hospital Foundation, 286 So.2d 439 (La. App. 1st Cir.1974).
*988 Res ipsa loquitur is a rule of circumstantial evidence. The rule applies when the facts shown suggest the negligence of the defendant is the most plausible explanation of the injury. Lasseigne v. Dauterive, 433 So.2d 334 (La.App.3d Cir.1983); Guillory v. Buller, supra. Thus it is normally determined at the conclusion of trial. McCann v. Baton Rouge General Hospital, 276 So.2d 259 (La.1973); King v. King, 253 La. 270, 217 So.2d 395, 397 (1968).
Once the doctrine has been applied to a given case the burden then shifts to the defendant to show an absence of negligence on his part. Langlinais v. Geophysical Service, Inc., 237 La. 585, 111 So.2d 781 (1959); Holliday v. Peden, 359 So.2d 640 (La.App. 1st Cir.1978); Wells v. Woman's Hospital Foundation, supra.
Res ipsa loquitur is irrelevant where a body of direct evidence is available explaining the activity leading to the injury. McCann v. Baton Rouge General Hospital, supra.
At the conclusion of the trial the plaintiff requested the judge to charge the jury as to the applicability of the doctrine to this case. The court refused, for reasons with which we agree, and which we will enumerate at the conclusion of our discussion of the evidence.
Plaintiff introduced the testimony of himself and his family as lay witnesses, which we have previously summarized, and the expert testimony of Dr. A.A. Zavaleta, a thoracic, vascular and general surgeon; Dr. Calvin Openshaw, a general and thoracic surgeon; and Dr. Paul McGarry, a forensic, anatomical, clinical and neuro-pathologist.
Defendants called Drs. Veprek, Emory, George Leonard, a pathologist, and Roger H. Tutton, a radiologist. All of these doctors are on the staff of Ochsner Clinic and participated in plaintiff's care while he was hospitalized. Drs. Veprek and Emory are named defendants. Defendants also called two doctors on the medical review panel: Dr. Dennis Rosenberg, the thoracic and cardiovascular surgeon who had been plaintiff's choice on the panel, and Dr. Robert Hewitt, who is also a thoracic and cardiovascular specialist.
We will discuss the medical testimony first as to the examination and treatment of plaintiff by the doctors associated with Ochsner Hospital and/or Ochsner Clinic.
Dr. Veprek, a resident on the Ochsner staff, was on duty when plaintiff first arrived in the emergency room. He recognized the seriousness of plaintiff's condition upon arrival, which we have discussed earlier in this opinion, and notified Dr. Emory, who admitted plaintiff to the hospital. Dr. Emory was plaintiff's treating physician during both of these hospitalizations and he was assisted by Dr. Veprek, the resident.
Dr. Emory confirmed the seriousness of plaintiff's condition in the emergency room and described his condition and treatment in full detail during his hospital stay including frequent x rays to determine the progress of the pneumonia. The doctor described the thoracentesis procedure done by Dr. Veprek as per his instructions and indicated Dr. Veprek was a qualified physician with an M.D. degree, two and one-half years of training in the United States, and 20 years of experience as a doctor in Europe.
After the unfortunate event with Mr. Culver and the catheter tube, which was part of a thoracentesis kit used by Dr. Veprek, Dr. Emory requested the chairman of the pharmacy committee to discontinue the use of that make of kit which contained the particular catheter. Various manufacturers make thoracentesis kits and the purchasing agent will buy equipment approved by the pharmacy committee. There are four different types of catheter trays made by different manufacturers with very little difference between them.
Dr. Emory examined all of the x rays at the time they were taken, but he did not notice the offending catheter until after Dr. DeCamp performed the second operation. Emory stated this was because the *989 catheter was so thin it was impossible to detect the fine line until after you knew it was there and where to look for it.
Dr. Emory stated pneumonia has a propensity for destroying lung tissue. He described the abscess found by Dr. DeCamp as a collection of pus, and concluded the catheter was locked in old pus in the pleura space, as the lung was having its own problems with staph pneumonia. There was no x-ray evidence of an intercavity abscess.
Emory was unable to explain why the catheter sheared off and suggested that it came in contact with a sharp edge, probably the needle, and broke off. Emory and the radiologist both reviewed the x rays daily and the catheter was not seen by either of them. The very fine line was simply lost in the rest of the x ray.
When asked what effect the removal of the right lower lobe of plaintiff's lung would have relative to function, Dr. Emory stated he could see no abnormalities after Dr. DeCamp's surgery. In general terms the lung has great resiliency and if you remove the lower lobe of a 62-year-old individual, he would have the same functional capacity which he had prior to his surgical procedure within about six weeks thereafter. If you remove the total lung, of course, there is a compromise, but the lobectomy plaintiff underwent should have no compromise that was not existing prior thereto, due to plaintiff's emphysema.
Dr. Emory said plaintiff's present problems are the result of the aging process. He concluded environmental factors, genetic factors, current infections or associated illnesses, diabetes, arthrosclerosis and emphysema are accelerating plaintiff's decline, and it is not the result of the catheter incident.
Emory was impressed with the fact that plaintiff had not been readmitted to the hospital with pneumonia or lung problems and was not even taking lung medicine at the time of trial, although he still takes diabetic and emphysema medications. Emory said the best control of diabetes is physical activity and the best management of emphysema is regular exercise. Plaintiff was doing neither of those things.
Dr. Veprek testified he was familiar with the thoracentesis procedure having performed it as a student, as a doctor in Europe and as a resident in this country. In preparation for the procedure he secured a sterile thoracentesis kit at the nurses station. The kits are relatively new. They are produced by various manufacturers and as improvements are made there are different modifications and designs. He could not tell which kit he used at the time.
The kit comes with a plastic tray which has a cover where various parts of the kit are stored. The proper procedure is to pull off the corners of the several wrappers, then put gloves on and open the kit in such a way that the inside of the wrappings are sterile. The top of the kit contains the preparations necessary to begin the procedure. This first part of the tray is designed for preparation of the skin and the surface of the skin to deaden the area so the patient will not feel the pain when the needle penetrates.
The bottom part of the tray contains the parts necessary for anesthesia which is the syringe, several needles and Xylocaine used for preparation of the chest. Several needles are used for this procedure, a thin one and a short one at the beginning to infiltrate the wall with Xylocaine solution to deaden the pain prior to penetration of the thicker needle.
Veprek stated that in the instant procedure the catheter is smaller in diameter than the inside of the needle and is threaded through the needle. The catheter must penetrate the infected area which is contaminated by bacteria, ahead of the procedure. Therefore, the catheter is protected with a plastic sleeve. Because there must be motion between the needle and the catheter you have a problem of pushing the catheter forward as it is inside a plastic bag to keep it sterile. There is no way to measure the catheter in the bag before you *990 push it in the patient because it would destroy all sterility.
The purpose of the catheter is to withdraw fluids. After Veprek secured the fluid he removed all of the needle before finishing the procedure and removed the catheter practically at the end of the procedure. He then applied antiseptic solution to the infected area and applied a band aid.
The steel needle is usually cut diagonally. It is sharp and cut at a right angle. At the completion of the procedure the catheter is entered into a plastic bag which goes into the tray. Veprek said the catheter has a line of radio opaque material introduced at the time of manufacture so it could be seen on x rays; however, sometimes it is visible and sometimes it is not.
Dr. Veprek said he had no way of knowing a portion of the catheter broke off in the procedure, and it would have been impossible to check the length of the catheter in the sleeve after the procedure, because its length prior to the procedure was not known.
Dr. DeCamp participated in the treatment of plaintiff. He was seen initially on June 4 and 5 on a social visit as he knew the family. Later he became more actively involved, particularly after the plaintiff's readmission in July. Because the doctors feared cancer, a bronchoscopy was performed, but the results were not definitive. The doctors were concerned because plaintiff was not doing as well as expected and by general agreement plaintiff underwent major chest surgery on July 19, 1977.
DeCamp's decision to operate was based upon three reasons: first, because plaintiff had been hospitalized on May 28 with chest pains, fever and an unexplained loss of 30 pounds, and he was still sick in July and was not getting well in spite of the treatment.
The second reason was that from the first day plaintiff was admitted there were x-ray changes in the lung and the changes were not improving after two months of treatment.
The third reason was that plaintiff had a long history of smoking, and had an obvious infection in the chest. Since it is not uncommon for cancer of the lung to manifest itself by pneumonia, which may occur when the breathing tubes are blocked by cancer, the doctors suspected plaintiff might have cancer. They had done every test short of a chest operation to find out whether or not plaintiff had cancer and had not been able to find any evidence. However, it frequently happens that a patient has cancer and it is not medically possible to prove it short of making an open operation on the chest.
Dr. DeCamp explained the right lung is divided into three parts: an upper part, a middle part and a lower lobe. Practically all of the abnormal findings were found in the lower lobe. There was a mass in that lobe which was an abscess, also known as a boil. The staph infection that plaintiff had in his lung was the same kind of infection that caused the abscess. Lying in the abscess was a small plastic tube between the lung and the chest wall about 1 millimeter in diameter and about 6 inches long.
In addition there was a thick rind on the whole lung like an orange peel. This scar tissue was the result of a chronic infection which plaintiff had for at least two months. (This covering is supposed to be tissue paper thin.)
The doctor had to decide how much lung to remove or whether he should remove any at all. DeCamp stated the first thing he is charged to do is to cure the patient and the second thing is to cure him with the most conservative type of surgery. After the operation the doctor did not feel he was dealing with cancer, but it was not a normal lobe, it was still diseased. DeCamp concluded there was enough disease in the lower part of the lung so that the lung was relatively useless to the patient. Knowing plaintiff had emphysema and that his lung function was not good, the doctor wanted to save as much of the lung as he could. Therefore he removed only that portion of the lung which was not going to do plaintiff any good for the rest of his life.
*991 Taking out the lobe had nothing to do with the catheter. It lay between the chest wall and the lung. Where the abscess was, there was just a pus pocket and no lung itself. The lung had been destroyed in that area and part of the catheter lay in the abscess. There was no evidence that the catheter had penetrated the lung.
The catheter came as a complete surprise, so Dr. DeCamp called Dr. Leonard, the pathologist, and gave him the removed lobe and the catheter. Dr. DeCamp then concluded the operation and plaintiff was discharged his eleventh post-operative day. After the surgery he discussed the catheter with plaintiff.
When last seen on September 13, 1977, plaintiff was free of symptoms, had no complaints, and had made a good recovery from the surgery two months prior thereto. In DeCamp's opinion the removal of the lower lobe of the right lung did not have a detrimental effect on plaintiff.
At the time of the operation DeCamp thought that the catheter contributed to the abscess, but the whole lobe was diseased and needed to be removed. However, later, on going over the x rays very carefully, the doctors began to see what they thought was the catheter, at least on some of the x rays; and it was apparent that the catheter was not originally in the abscess because the abscess started in a different part of the lung. It was only as the abscess became bigger that it became incorporated in the catheter. He has now concluded that the catheter had nothing to do with the abscess formation.
In his opinion the catheter, which is very small and is made of relatively innocuous material, had been inserted between the lung and the chest wall, and not inserted into the lung cavity, and it was not the cause of the abscess. He concluded staphylococcal bacteria, and not the catheter, caused the abscess.
Dr. Tutton, the radiologist, examined the x rays. At no time did he see the catheter prior to DeCamp's operation. There were too many other narrow white lines in the same area. It was only after the operation that he learned where the catheter was found. Only then was he able to find the thin little line on the x ray.
Dr. Leonard, an expert in the field of clinical and anatomical pathology, testified that Dr. DeCamp called him into the operating room and gave him the lobe and the catheter. He preserved the tissue in Formaldehyde and sliced it at ¼-inch increments to look for lesions, tumors or other abnormalities. He found chronic pneumonia. There was an abscess on the outside of the lung. He was concerned there might be cancer present because of plaintiff's prior history of smoking and also because plaintiff had staph pneumonia. There is a relationship in that a lung in which the air tubes are blocked by cancer is more likely to develop pneumonia.
Prior to the operation there was a great deal of evidence plaintiff might have cancer, but after the operation no evidence of cancer was present. There was evidence of inflammation other than where the abscess was and evidence of emphysema.
In his review of the tissue there was no reason to believe that the catheter caused the abscess. Specifically when a foreign body is in the tissues there is a foreign body reaction which consists of a special type of cell called a foreign body giant cell. There was no evidence of any of those cells in this tissue.
The independent medical experts who had nothing to do with plaintiff's examination or treatment were Drs. Zavaleta, Openshaw and McGarry. They testified for plaintiff. Drs. Dennis Rosenberg and Robert Hewitt, thoracic and cardiovascular surgeons, members of the medical review panel, were called as witnesses by defendants.
Dr. Zavaleta reviewed all of the medical records and x rays and was familiar with plaintiff's history. In his own practice he uses only a needle in a thoracentesis procedure and does not consider the use of a catheter needle necessary, although he was taught to use it in medical school in such a proceeding.
*992 Zavaleta did not think it was Veprek's fault that part of the catheter sheared off. He said the needle is pulled out of the chest and is very, very sharp, and as you pull out the catheter against the needle it can break off. It frequently does, and this is not the fault of the doctor.
His criticism of Veprek's procedure is that the length of the catheter should have been measured as it was withdrawn. Then the doctor would have known that a portion still remained in the patient.
He also felt the x rays should have been more carefully reviewed by a staff of doctors including the chief of radiology, the chief resident and the thoracic surgeon. However Zavaleta admitted it would have been very difficult for the doctors to have seen it in the x rays, because unless you are looking for it, it is very hard to find. As a matter of hindsight it could be criticized, but objectively it would be very difficult because the amount that broke off was so small.
Zavaleta found no evidence that the catheter was pushed into plaintiff's lung, only that it entered the pleura. He agreed on readmission to the hospital the doctors should have suspected cancer and he found no fault with DeCamp if he felt the lobe should be removed because of its general condition and not because of the abscess. He did state, however, that plaintiff would not have needed the second operation except for the presence of the catheter.
Dr. Openshaw testified he reviewed all of the medical evidence, including the x rays, and concluded that but for the presence of the catheter left in plaintiff's body the removal of the lobe would not have been necessary. In his opinion the abscess resulted from the foreign body inserted into plaintiff's lung.
After reviewing Dr. Veprek's deposition and the medical reports, he found evidence of substandard care by Dr. Veprek. He felt the patient had only a small amount of fluid in the chest and the use of a needle would have been sufficient for the procedure, rather than a needle catheter. He found it negligent on Veprek's part not to measure the catheter after it was withdrawn.
He concluded that except for the presence of the foreign body and the abscess secondary to it, there would have been no need for the major surgical operation. This opinion was based upon the fact that the pneumonia was clearing very well and that plaintiff was tremendously improved upon discharge from the first admission, and feeling much better.
Openshaw concluded the impairment of the right lung, which constitutes 20% of plaintiff's breathing space, was an unavoidable result of the lobectomy. He also felt there would be greater or lesser limitation in the chest wall function, because a person who already had a limitation of pulmonary function of 20% of his breathing space would have his prior problems aggravated. It would also increase his sense of "feeling bad" and general poor health. (Openshaw called this medical problem "morbidity.")
On cross-examination Dr. Openshaw stated he initially concluded the abscess could be caused by natural processes, and that a patient with staph pneumonia could develop an abscess on that account.
The doctor thought it was not difficult to locate the catheter on the original x rays, but admitted that knowing it was there helped. He did not fault Dr. DeCamp for removing the lobe.
Dr. McGarry testified that after a review of medical records, x rays and pathology reports, he concluded the abscess was located in the upper part of plaintiff's right lower lobe, the catheter was located in that area, and the pneumonia was located in a different part. Thus he concluded the operation would have been unnecessary but for the catheter which he believed caused the abscess.
On cross-examination the doctor admitted he had never seen the catheter in the abscess and had only been told it was found there. He also stated that one of the characteristics of "staph" is to cause abscesses, frequently multiple and small, and he agreed that Dr. DeCamp was in the best *993 position to make the determination to remove the lobe at the time of the operation if he considered it was warranted.
Dr. Rosenberg, selected by plaintiff for his representative on the medical review panel, was called as a defendant witness.
Rosenberg testified he has done thoracentesis procedures many times and that it is a very common procedure in the diagnosis and therapy of chest conditions. After reviewing the records and x rays he concluded plaintiff was treated with the proper standard of care by all of the physicians concerned. He reviewed Dr. Veprek's deposition as to the procedure he used in the thoracentesis and said while there are many ways of doing the procedure, Dr. Veprek's way was the accepted way. He also reviewed the x rays. In many of the x rays he cannot see the catheter even to this day. In some he can pick it up spontaneously, but it is very difficult to know if he would have been able to do so if no one had pointed it out to him first.
He reviewed the treatment Dr. Emory gave plaintiff and found plaintiff received the proper and accepted treatment. Had plaintiff been his patient he would have treated him in the same manner.
Rosenberg did not find any diminution or problem with the ability of plaintiff to function as far as his lungs were concerned after the surgery. He said that frequently after the diseased portion of a lung which is functionless is removed, the pulmonary function improves because the remainder of the lung can expand. It can then adequately function within the area which was filled with the diseased lung prior to its removal. Frequently the two remaining lobes on the right side and the one on the left side will be better than they were before the operation.
Dr. Rosenberg found no evidence of diminution of function or respiratory disability resulting from the lobectomy. The x rays of September 13, 1977 confirm there was no problem of diminution, and some of the lung capacity was practically the same as it had been previously. Rosenberg said that he and his colleagues on the medical review panel looked at the catheter in great detail and concluded it had nothing to do with the sequence of events.
The x-ray film of June 3, 1977 shows pneumonitis, which is an infection, with early abscess formation with a large mass in the chest. There was no catheter present at that time. The disease went on progressively and the lobe was removed. Rosenberg concluded the small sterile plastic catheter did not lead to the abscess which was there before the catheter was inserted and it did not lead to the accumulation of the mass, which occurred after the catheter was inserted. He further said it did not result in the lobectomy, which was the proper treatment of the lung abscess, with or without the catheter.
The doctor did not regard the shearing off of the catheter as due to the negligence of the person inserting it. It is an admitted risk, complication, or unfortunate incident which does occur with these types of catheters. Portions of the catheter can break off. They do frequently, and you may never know about it. They may be sheared off by the sharp point of the needle, or sometimes they stretch like Saran wrap. It could be due to faulty material; it could get impinged on the chest wall, or the bone, or the edge of the needle. There are innumerable reasons why they break off, but the majority of the time the cause is unknown.
Rosenberg concluded you could not check the catheter beforehand because you would expose the sterile pack to outside influences and infections, and possibly not be able to get the catheter back into the sleeve or the needle in order to do the test.
Dr. Hewitt was the other member of the medical review panel to testify. He said it is standard practice to permit a resident to perform a thoracentesis and the procedure as described by Dr. Veprek was proper. He indicated that catheters break through no fault of the doctor who is inserting it and that many implantations are done with silastic, such as pacemaker leads, or implantations by plastic surgeons. The same *994 material is used in heart valves and in shunts in the brain.
He explained it was extremely difficult to see a piece of catheter on the x ray and doubts he would have detected it if he had not known it was there. The doctor concluded the catheter did not penetrate the lung since there was no evidence of collapse of the lung. In his opinion the effect of the removal of the lower right lobe of the lung would have no significant effect on plaintiff's breathing capacity.
With all of the evidence now before us, we look to the requirements necessary to invoke the doctrine of res ipsa loquitur. The trial judge refused to apply the doctrine. He found the breaking or shearing off of the catheter in plaintiff's body was without negligence on plaintiff's part. However, the court concluded there were several different reasons which could have caused the catheter to shear off, other than negligence on Veprek's part. It could have been something defective in the thoracentesis kit or the catheter itself, and there was no evidence at all to indicate the mere fact it sheared off resulted or was caused by Veprek's negligence.
The court further noted there was much testimony to indicate it was impossible with this type of catheter and sleeve to measure the catheter following its removal from plaintiff's body, although there was some testimony to the contrary.
We find the trial court was correct in refusing to invoke the doctrine. All of the experts, even plaintiff's specialists, concede it is not uncommon for these catheters to break, and there is no way to determine what causes the break. Thus plaintiff has failed to show this accident would not have occurred in the absence of negligence.
This accident is not equated with leaving a lap sponge in a patient. In that case, someone could count the number of sponges used and the number retrieved; here the sterility of the equipment would be invaded, and not knowing the catheter measurement before it was inserted, its length after it was retrieved would be of no moment.
Not only do we agree that the doctrine is not applicable here, we find from the evidence that there was no negligence on the part of Drs. Emory or Veprek or any of the Ochsner physicians. We agree with Dr. Emory that plaintiff's present problems have no relationship to the unfortunate incident with the catheter but are the result of plaintiff's prior and on-going health problems.
Plaintiff was 69 years old at the time of trial and had had no further need for medical treatment or medication relating to his lungs since he was last seen by Drs. Emory and DeCamp in 1977. It would thus appear that the diligent care plaintiff received from the Ochsner doctors, particularly Drs. Emory and DeCamp, during the periods he was hospitalized in 1977 may have possibly saved his life. We agree with the medical review panel and the jury findings that there was no evidence of negligence. The appellant has failed to carry his burden of showing that the finding of the jury was clearly wrong.
For the reasons assigned, the judgment appealed from is affirmed.
AFFIRMED.
NOTES
[1] Dr. Paul DeCamp was also named a defendant but was voluntarily dismissed by plaintiff. Ochsner Clinic and Alton Ochsner Medical Foundation were named defendants but were never served.
[2] Looking down the windpipe and into the breathing tubes and then the mediastinum to get a view or the tissue.