398 So.2d 43 (1981)
Augusta GUILLORY, Plaintiff-Appellant,
v.
Dr. D. H. BULLER and Dr. Tyler J. Kent, Defendants-Appellees.
No. 8104.
Court of Appeal of Louisiana, Third Circuit.
March 11, 1981.
*44 Simmons & Nelson, Otha C. Nelson, Baton Rouge, for plaintiff-appellant.
Pugh & Boudreaux, Charles J. Boudreaux, Sr., Lafayette, for defendants-appellees.
Before DOMENGEAUX, STOKER, and DOUCET, JJ.
DOMENGEAUX, Judge.
This is a medical malpractice suit brought by Augusta Guillory against Dr. Daniel H. Buller and Dr. Tyler T. Kent in connection with two surgical procedures performed on the plaintiff's left armpit by Doctors Buller and Kent on May 30th and July 20, 1978, respectively.
On May 29, 1978, plaintiff was admitted to Opelousas General Hospital by her doctor, Dr. August C. Terrence, for treatment of an infection in her left armpit. At Doctor Terrence's request, Doctor Buller, a general surgeon, examined plaintiff the next day, May 30th, and diagnosed her condition as the disease of axillary hidradenitis suppurativa with an abscess formation. In layman's terms, Doctor Buller described plaintiff's condition as "a nest of boils in the armpit." The condition was also described as an infection of the sweat glands in the armpit.
Doctor Buller explained that before he could provide treatment that would cure plaintiff of her disease, the infection had to be cleared. To achieve this result, he proceeded to drain the pus from the abscess. The next day, the plaintiff was discharged from the hospital and was told to return at a later date so Doctor Buller could check her progress.
Doctor Buller next examined plaintiff on July 18, 1978, and determined that her infection had been cleared by the minor surgery performed on May 30th. He felt that the chronic or long term phase of her disease would best be treated by removal of all of the diseased tissue and so recommended this to plaintiff. He also referred to her Doctor Kent for the surgery because he felt Doctor Kent was more capable than he to perform the particular operation that plaintiff needed.
On July 20, 1978, Doctor Kent removed the entire hair-bearing portion of plaintiff's left armpit, an area measuring 9 centimeters by 4 centimeters (about 6 square inches). The surgery was designed to rid plaintiff of her disease. He then closed the wound by suturing the remaining skin together. He allowed plaintiff to wear a sling to immobilize her arm while the skin healed together. Plaintiff was discharged from the hospital on July 24th but returned on July 27th, August 3rd, and August 8th, during which visits Doctor Kent performed piecemeal removal of the sutures, a common procedure for this type of operation. Doctor Kent also examined plaintiff on August *45 22nd and encouraged her to use and exercise her arm in order to restore its mobility.[1]
Doctor Kent saw the plaintiff for the last time on September 26, 1978. At this examination he was dissatisfied with the progress she had made on her own and recommended that she undergo physical therapy. However, instead of following his advice (she did not keep the physical therapy appointment made by Doctor Kent), she sought the advice of other doctors.
In her suit, filed May 3, 1979, plaintiff alleged that these other doctors advised her that corrective surgery is needed to correct the surgery performed by Doctors Buller and Kent. Apparently, plaintiff was still having difficulty in lifting her arm upward from her side, a problem she began experiencing after the July 20th surgery. In her petition, plaintiff alleged:

"VII.
Plaintiff avers that her resulting injury would not have occurred if all defendants had exercised the degree of care, skill and knowledge ordinarily exercised by physicians, registered and licensed practical nurses in this area and throughout the United States and as a result of their individual and collective failures plaintiff suffered damages that would not otherwise have occurred.

VIII.
Alternatively, plaintiff avers and specifically pleads the doctrine of res ipsa loquitur as to the defendants."
Trial on plaintiff's suit was held April 21 and April 22, 1980. Following plaintiff's evidence, the defendants moved for, and were granted, a directed verdict. From that judgment granting the directed verdict plaintiff has appealed. We affirm.
In Campbell v. Mouton, 373 So.2d 237 (La.App. 3rd Cir. 1979), this Court adopted the following standard to determine whether a motion for a directed verdict should be granted:
"On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence not just that evidence which supports the non-mover's casebut in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury."[2]
After considering all the evidence, we believe that reasonable men could not arrive at a verdict contrary to the defendants, therefore we affirm the judgment granting defendants a directed verdict.
A plaintiff's burden of proof in a medical malpractice suit is set out in La.R.S. 9:2794:
"A. In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq., or a dentist licensed under R.S. 37:751 et seq., the plaintiff shall have the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily *46 exercised by physicians or dentists licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians or dentists within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill, and
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred."
The statute also provides that injury alone does not raise a presumption of the physician's negligence. Also, by its own language, R.S. 9:2794 does not apply if the doctrine of res ipsa loquitur is found to be applicable. However, we find for reasons explained later that the doctrine of res ipsa loquitur does not apply to the instant case.
In an effort to meet her burden of proof plaintiff called as witnesses the defendants, under cross-examination; Doctors Edgar P. Breaux, Joseph G. Patton, and Gregory M. Savoy, all of whom are general surgeons; and Doctor John Finley, a plastic surgeon.
Plaintiff also called Doctor Terrence and some lay witnesses including herself. However, in determining whether or not the defendants possessed the requisite degree of knowledge or skill or whether they failed to exercise reasonable care and diligence, this Court is guided by the views and opinions of expert witnesses who are members of the medical profession and who are qualified to testify on the subject. Thibodeaux v. Aetna Casualty and Surety Company, 216 So.2d 314 (La.App. 3rd Cir. 1968); Lauro v. Travelers Insurance Company, 261 So.2d 261 (La.App. 4th Cir. 1972), writ denied, 262 So.2d 787 (La.1972). Those qualified to testify on the subject, other than the defendants, were Doctors Breaux, Patton, Savoy, and Finley.
Doctor Breaux, a general surgeon in Lafayette with 32 years of experience, examined plaintiff on September 26, 1978, which was the date that Doctor Kent last saw plaintiff. Doctor Breaux testified that as of September 26th, plaintiff probably would have regained normal use of her arm and shoulder if she would have undergone physical therapy. In fact, she was given an appointment by Doctor Breaux to see a physical therapist on October 2, 1978, but she did not show up for the appointment.
Doctor Breaux next examined plaintiff during the trial on April 21, 1980. At this latter time he felt that Z-plasty followed by physical therapy would be the quickest way to rehabilitate her.[3]
Doctor Breaux read the operational reports prepared by Doctors Buller and Kent after their respective surgical procedures of May 30th and July 20, 1978.[4] He testified that he would have performed the operations exactly as defendants performed them.
Doctor Patton, a general surgeon in Opelousas for 17 years prior to trial, saw plaintiff on September 28, 1978, and diagnosed her condition as contracture of the axilla following surgery for what he thought was chronic recurrent hidradenitis. Plaintiff indicated to him that she wanted immediate relief from her condition so he told her that Z-plasty surgery would provide immediate relief. However, Doctor Patton testified that if she had been his patient he would have used physical therapy on her arm for 6 to 8 weeks following his examination on September 28th. If, after this time, plaintiff's *47 condition had not improved or her arm had not returned to a relatively normal range of motion, then he would have suggested that Z-plasty surgery be done.
Doctor Patton read the two operational reports and felt that Doctor Buller and Doctor Kent performed good competent surgery based on the reports. He opined that the formation of scar contracture did not create an inference in his mind that the surgeon was negligent. In Doctor Patton's opinion, plaintiff's arm was in its present condition because she did not perform her physical therapy properly.
Doctor Savoy of Mamou, a general surgeon with 7 years experience, termed Doctor Kent's surgical procedure and method of managing plaintiff's condition "absolutely satisfactory." Prior to trial he examined plaintiff only once on October 5, 1979, and felt that Z-plasty surgery might be the only thing to help her. She complained of pain when she attempted to lift her arm at a greater distance than 90 degrees. He attributed this complication to the way her body makes scar tissue (and observed that she had a contracture of her scar). Doctor Savoy testified that there was no way he, as a general surgeon, could have determined prior to surgery that this complication would occur. Even if he had detected the problem at the earliest possible time6 weeks after surgeryhe would have recommended physical therapy initially, as Doctor Kent had done.
Doctor Savoy also read the two surgical reports and thought the procedures used were standard; he felt Doctors Kent and Buller handled the disease as any competent general surgeon would have. The fact that plaintiff subsequently developed some scar contracture which apparently restricts her from lifting her arm did not indicate to him that her doctors were negligent in any way.
Doctor John Finley, a plastic surgeon with Ochsner Clinic in New Orleans, saw plaintiff on June 11, 1979, about 8½months after plaintiff last saw Doctor Kent. At that time he felt a skin graft or Z-plasty surgery might help plaintiff. However, at the trial he indicated that he was hesitant to say that plaintiff needs Z-plasty surgery.
He also felt the surgical approach used by the defendants was a good sound approach and was in accordance with good medical standards. We note that Doctor Finley had performed this same operation about ten times.
All the surgeons who testified for plaintiff felt the defendants had performed competent surgery. Those who recommended Z-plasty did so because it would afford plaintiff immediate relief from the discomfort of not having full use of her left arm; they did not recommend it to correct the surgery performed by Buller and Kent. The expert evidence is overwhelming and uncontradicted that plaintiff's failure to recover as expected was not due to any negligence on the part of Doctors Buller and Kent. Instead, the doctors agreed her present disability was probably due to the way her body forms scar tissue, an unpredictable and uncontrollable phenomenon, and the fact that plaintiff did not undergo any physical therapy, a fact which she admitted at trial, even though it had been prescribed by Doctor Kent, Doctor Breaux, and a Baton Rouge doctor who did not testify. Since plaintiff failed to produce any expert testimony tending to establish negligence on the part of Doctors Buller and Kent, or a failure on their part to meet the required standard of knowledge, skill, and care in this case, we must conclude that plaintiff failed to overcome the burden of proof imposed by La.R.S. 9:2794. Consequently the granting of a directed verdict in favor of the defendants was proper.

RES IPSA LOQUITUR
Plaintiff argues that the doctrine of res ipsa loquitur applies. We disagree. The doctrine of res ipsa loquitur would be appropriate only if the body of proof establishes or suggests that the alleged negligence of the defendants excludes every other reasonable hypothesis as to the cause of plaintiff's problem. In other words, the rule applies when the facts shown suggest the negligence of the defendant as the most plausible explanation of the injury. Helms v. St. Paul Fire & Marine Insurance Co., 289 *48 So.2d 288 (La.App. 3rd Cir. 1974). In the instant case, none of the facts shown suggest that the defendants' negligence was the cause of plaintiff's injury. Rather, the facts suggest that plaintiff's injury was caused by the way her body forms the scar tissue, a phenomenon over which the surgeon has no control and cannot anticipate, and the fact that plaintiff absolutely failed to undergo the prescribed regimen of physical therapy. Hence, the principle of res ipsa loquitur does not apply in the instant case. See also Walker v. Union Oil Mill, Inc., 369 So.2d 1043 (La.1979); Hancock v. Safeco Insurance Company, 368 So.2d 1162 (La.App. 3rd Cir. 1979), writ denied, 369 So.2d 1377 (La.1979); Sugulas v. St. Paul Insurance Company, 347 So.2d 855 (La.App. 3rd Cir. 1977).

INFORMED CONSENT
On several occasions during the trial, plaintiff's counsel attempted to raise the issue of informed consent through his questioning of the witnesses. On every occasion, the defendants objected on the basis that the plaintiff's questioning was an attempt to expand the pleadings. The district court sustained all of defendants' objections.
Plaintiff argues that the trial court erred in disallowing any evidence tending to show that the defendants failed to inform plaintiff beforehand of the extent of her surgery, the risks involved, and the possible complications which might result after the operation. Plaintiff argues that she would not have consented to undergoing the operation had she known the size of the area to be excised, and if she had been forewarned of the possibility that she would lose the use of her arm. We think the court's decision was correct.
Nowhere in plaintiff's petition did she allege that Doctor Buller or Doctor Kent failed to inform her of the extent of the surgery, nor did she allege that she would not have undergone the surgery had she been adequately informed. Plaintiff alleged only that her injury would not have occurred if the defendants had exercised the degree of care, skill, and knowledge ordinarily exercised by physicians in the area. Alternatively, plaintiff pled the doctrine of res ipsa loquitur. Thus, plaintiff's petition did not raise the issue of informed consent.
Under proper circumstances proof beyond the pleadings, even if objected to, may be admitted and considered when permission to amend the pleadings is requested and granted. La.C.C.P. Art. 1154. However, plaintiff did not request permission of the court to amend the pleadings to confirm to the evidence she wished to introduce with respect to the issue of informed consent. Defendants' timely objections, coupled with plaintiff's failure to move for an amendment of the pleadings is fatal to an issue (here, informed consent) not raised by the pleadings. Wanda Petroleum Company v. Mac Drilling, Inc., 353 So.2d 474 (La.App. 3rd Cir. 1977), writ denied, 355 So.2d 258 (La.1978).

DECREE
For the above and foregoing reasons the judgment of the district court is affirmed. All costs are assessed against the plaintiff, Augusta Guillory.
AFFIRMED.
NOTES
[1] Doctor Kent explained that the skin in the armpit is usually very loose and flexible. Following an operation in which much of this skin is removed, and where the skin which remains is then sewn together, this skin is tight and inflexible because it has been stretched to occupy the space of the removed skin. Thus, the arm cannot be easily raised following the operation. Only by moving and exercising the arm, which movement has a tendency to further stretch the skin, will the patient regain full range of motion.
[2] Without explicitly saying so, the Louisiana Supreme Court has apparently approved the standard adopted by this Court in Campbell v. Mouton, supra. See Breithaupt v. Sellers, 390 So.2d 870 (La.1980).
[3] Z-plasty is a technique for lengthening contracted scar tissue.
[4] Doctor Breaux testified that the surgeon usually dictates his report on the same day as the operation. He said that he dictates his reports immediately after surgery.