502 So.2d 232 (1987)
Clayous ROYER (Deceased), Lucille Leger Royer, Peggy Joe Royer Frederick, and Juanita Royer Babineaux, Plaintiffs-Appellants,
v.
ST. PAUL FIRE & MARINE INSURANCE COMPANY, Continental Insurance Company, D.J. Palmintier, M.D., and Lafayette General Hospital, Defendants-Appellees.
No. 86-208.
Court of Appeal of Louisiana, Third Circuit.
February 4, 1987.
Writ Denied March 26, 1987.
*233 Anatole J. Plaisance, Baton Rouge, George T. Oubre, LaPlace, Champagne and Colomb, Patrick L. Colomb, Lafayette, for plaintiffs-appellants.
Onebane and Assoc, Timothy J. McNamara, Charles J. Boudreaux, Lafayette Gen. Hosp., Radiology Group, Coolidge Lane, Hamilton Medical Group, Lafayette, for defendants-appellees.
Before DOUCET, LABORDE and KING, JJ.
DOUCET, Judge.
Clayous Royer, decedent, originally filed this medical malpractice suit in 1973 against Dr. D.J. Palmintier, Dr. Albert R. Corne, Jr., Lafayette General Hospital, and their respective insurers, St. Paul Fire & *234 Marine Insurance Company and Continental Insurance Company. Upon his death, Mr. Royer's surviving spouse and two major children were substituted as party plaintiffs. Suit against Dr. Corne was dismissed on the motion of plaintiffs before trial. Plaintiffs appeal from a directed verdict in favor of the remaining defendants.
In 1971, Clayous Royer sought treatment from a dermatologist for a small ulcer on his left ankle. At this time, Mr. Royer was in apparent good health and was employed as a cook on an offshore oil well. However, he returned to the dermatologist the following year with the same problem and was referred to defendant, Dr. D.J. Palmintier, a general surgeon. Dr. Palmintier diagnosed Mr. Royer to be suffering from varicose veins and early arterial insufficiency. Dr. Palmintier scheduled Mr. Royer for surgery to remove the varicose veins. Mr. Royer was admitted to Lafayette General Hospital on June 25, 1972. Because of the evidence of arterial insufficiency, Dr. Palmintier ordered that an arteriogram be performed on Mr. Royer. An arteriogram is an X-ray of the arteries into which a contrast material, or dye, has been injected. The examination enables a physician to determine the extent and location of plaque deposits in the patient's arteries.
Dr. Palmintier referred Mr. Royer to Dr. Brendan Miles, a radiologist, who would perform the arteriogram. Dr. Miles was a member of a group of radiologists which provided radiological services to Lafayette General. The contrast material, or dye, was injected by Dr. Miles into Mr. Royer's bloodstream through a catheter inserted into a major artery in his groin. X-rays were taken and Mr. Royer was returned to his room in apparent good health at approximately 5:00 P.M.
Shortly thereafter Mr. Royer began exhibiting symptoms of severe pain. Dr. Miles stated that he checked Mr. Royer at about 5:30 P.M. and then telephoned Dr. Palmintier. Dr. Palmintier arrived at the hospital around 6:00 P.M. After examining the X-rays and conferring with Dr. Miles, he telephoned Dr. Leslie Guidry, a cardiovascular surgeon. Dr. Guidry determined that immediate surgery was necessary to restore circulation to Mr. Royer's legs. During surgery, Dr. Guidry constructed a bypass of Mr. Royer's lower aorta which was blocked, and removed accumulated plaque from other areas of his arterial system. Dr. Guidry felt that the operation restored the circulation to Mr. Royer's legs and feet. However, because of the interruption of circulation, Mr. Royer developed dry gangrene of the left foot. Shortly after the operation, he also suffered a partial loss of the functioning of his kidneys necessitating dialysis and treatment by Dr. Albert Corne.
Mr. Royer remained at Lafayette General Hospital until July 31, 1972 when he was transferred to the Veterans Administration Hospital in New Orleans. As a result of the gangrene, his left leg was later amputated approximately eight inches below the knee. During subsequent years, Mr. Royer was periodically treated at the Veterans Administration Hospital in New Orleans and Alexandria. He died on March 9, 1984. The cause of death was listed as cardio-respiratory arrest as a consequence of hypertension and chronic renal failure.
On appeal, plaintiffs claim the trial court erred by denying plaintiff-decedent leave to file three amended petitions and by directing verdicts in favor of defendants. A related issue is whether the trial court erred in finding that the doctrine of res ipsa loquitur was not applicable to the facts of this case.

AMENDED PETITIONS
Clayous Royer originally filed suit on June 4, 1973. On June 17, 1975, an amended and supplemental petition was filed making the Veteran's Administration a party plaintiff. The trial court later sustained defendants' exception of no right of action and dismissed the Veterans Administration as a party plaintiff. No appeal has been taken on this issue.
On May 1, 1978, Mr. Royer filed a certificate of readiness for trial stating that all issues were joined and that discovery procedures *235 were complete. Trial was set for September 28,1978 but was later continued on the grounds that Mr. Royer had to undergo surgery. Two subsequent trial dates were continued on the motion of all parties. Trial was then set for October 2, 1980.
On July 25, 1980, plaintiff filed a second amended and supplemental petition which alleged, for the first time, the vicarious liability of the original defendants for the negligence of Dr. Brendan Miles and also increased the total amount of damages sought. Although actions of Dr. Miles, specifically the injection of the dye through a catheter which apparently dislodged some material which caused the blockage of Mr. Royer's kidneys, had been set forth in the original petition, no negligence was alleged on his part nor was he made a party defendant.
A hearing was held on September 2, 1980, after which the trial court denied plaintiff leave to amend except to increase the amount of damages sought. Plaintiff-decedent appealed the ruling of the trial court. This court dismissed the appeal on the grounds that the ruling was an interlocutory judgment which would not cause irreparable injury. Royer v. St. Paul Fire & Marine Insurance Co., 393 So.2d 936 (La. App. 3rd Cir.1981).
Although some of plaintiff-decedent's amended petitions were entitled in part "supplemental", all of them involved issues which could have been included in his original petition and did not arise or become exigible since the filing of the original petition. Therefore, they could not have been technically considered supplemental pleadings. LSA-C.C.P. art. 1155; Adema v. Elliott, 223 So.2d 464 (La.App. 4th Cir.1969).
A plaintiff may amend his petition after defendant has answered only by leave of court or written consent of the adverse party. LSA-C.C.P. art. 1151. A trial judge has much discretion in this regard and its decision granting or denying a party's request to amend or supplement a petition will not be disturbed absent an abuse of discretion. CDT, Inc. v. Greener & Sumner Architects, Inc., 453 So.2d 1252 (La.App. 3rd Cir.1984); Mead v. Mead, 442 So.2d 870 (La.App. 3rd Cir.1983), writ denied, 445 So.2d 452 (La.1984); White v. Cumis Insurance Society, 415 So.2d 574 (La.App. 3rd Cir.1982), writ denied, 420 So.2d 164 (La.1982).
Plaintiffs cite Giron v. Housing Authority of City of Opelousas, 393 So.2d 1267 (La.1981) for the proposition that amendments are favored under the Louisiana Code of Civil Procedure as well as the Federal Rules of Civil Procedure upon which our article 1151 is largely based. We agree in principal with this assertion. Plaintiffs also cite in support of the liberal allowance of amendments, the case of Wallace v. Hanover Insurance Company of New York, 164 So.2d 111 (La.App. 1st Cir. 1984), writ denied, 246 La. 598, 165 So.2d 486 (1964).
In an article entitled "Amendment of Pleadings in Louisiana", 43 Tul.L.Rev. 211 (1969), the late Judge Albert Tate, Jr. commented on the Wallace, supra, case, among others, and amendments in general:

"Wallace v. Hanover Insurance Company contains the most complete jurisprudential discussion yet of the Louisiana amendment articles. The thrust of the opinion is that amendment should always be permitted in the absence of serious prejudice to the opponent. However, the court also "categorically" stated that "a trial judge abuses his discretion granted under Article 1151 when he allows an amendment which raises a new issue or defense at such a time as not to afford the other party adequate time to prepare his case to meet the new issue or defense." As the decision notes, at least up until the actual trial, such prejudice may usually be cured by a continuance. Of course, the closer to the trial date that an amendment is offered, the greater the need for a continuance; but, balanced against curing prejudice by such continuance, are other resultant prejudicial factors in the form of additional delay, legal expense and the disruption *236 of orderly trial calendaring by the court. When amendment is offered tardily without justification for the delay, these factors may outweigh the merit-justice interests which favor permitting it." (Footnotes omitted)
The record does not contain a transcript of the hearing or any reasons for the trial court's partial denial of plaintiff-decedent's second amended petition other than the minutes of court which read, "the court will deny the request for filing of Amending and Supplemental Petition and finds that setting up new issues comes to [sic] late." From later statements by defense counsel it can be gleaned that defendants filed an exception and plea of prescription to plaintiff-decedent's second amended petition. However, the record does not contain a copy of it, nor does the judgment denying leave to amend sustain any such exception. Because we have no record of the arguments, if any, of defendants on the issue of prejudice, or whether the trial judge offered to continue the trial date, or whether plaintiff-decedent offered any evidence justifying such an amendment seven years after suit was filed, we pretermit a decision as to whether the trial court erred in denying leave to amend. We do this because even if we were to find that the trial court erred in this respect, for the following reasons we would be constrained to render judgment in favor of the defendants and against the plaintiffs on the issue of the defendants' vicarious liability for any negligence of Dr. Miles.
Subsequent to trial of this case in 1985, the trial court left the record open for sixty days to allow plaintiff to proffer evidence on, among other matters, the issue of vicarious liability on the part of Dr. Palmintier and Lafayette General for any negligence of Dr. Miles. Plaintiffs had the opportunity to proffer any evidence on, among other matters, the issue of vicarious liability on the part of Dr. Palmintier and Lafayette General for any negligence of Dr. Miles. Plaintiffs had the opportunity to proffer any evidence they had on this issue. More than one thousand pages of depositions and attachments were proffered by plaintiffs and defendants. The evidence proffered as well as testimony and evidence adduced at trial show that neither Dr. Palmintier nor Lafayette General could be held vicariously liable for any acts of Dr. Miles.
The basis for plaintiff's claims of vicarious liability on the part of the defendants is found in La.C.C. art. 2317 and La.C.C. art. 2320.
La.C.C. art. 2317:
"We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody. This, however, is to be understood with the following modifications".
La.C.C. art. 2320:
"Masters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed.
Teachers and artisans are answerable for the damage caused by their scholars or apprentices, while under their superintendence.
In the above cases, responsibility only attaches, when the masters or employers, teachers and artisans, might have prevented the act which caused the damage, and have not done it."
Any such liability on the part of Lafayette General would be based on the principle of respondeat superior.
Dr. Miles was a member of the Radiology Clinic (the Clinic), a partnership composed of several radiologists formed for the purpose of providing radiology services to area hospitals including Lafayette General. Services were rendered pursuant to a contract between the Clinic and the hospital. The Clinic provided much of its own equipment and maintained all of the equipment it used at its own cost. The Clinic employed its own X-ray technicians over whom the hospital had no supervision or control. The hospital had no supervision or control over the professional medical *237 judgment of the radiologists although the hospital reserved the right to terminate the contract if, in its and a third party's opinion, the services provided by the Clinic became substandard.
The Clinic billed its own patients although the hospital collected the payments, remitting a percentage to the Clinic. No social security or FICA was withheld by the hospital from the Clinic's share of fees collected. The Clinic provided its own malpractice and workmen's compensation insurance. The contract did provide that the partners of the Clinic were to be members of the active medical staff of the hospital. Dr. Miles was neither an agent, servant, nor employee of Lafayette General Hospital. The jurisprudence is well settled that under the circumstances present in this case, a hospital cannot be held vicariously liable under the doctrine of respondeat superior for any negligence of a physician such as Dr. Miles. Suhor v. Medina, 421 So.2d 271 (La.App. 4th Cir.1982); Badeaux v. East Jefferson General Hospital, 364 So.2d 1348 (La. App. 4th Cir.1978); Beck v. Lovell, 361 So.2d 245 (La.App. 1st Cir. 1978). The record contains no evidence which would render Dr. Palmintier vicariously liable for any negligence of Dr. Miles. Neither Dr. Miles nor Dr. Palmintier were the agent, servant, or employee of the other. The two physicians practiced different types of medicine completely independent of each other.
Plaintiffs contend that, should this court find the trial court erred, a remand of this case would be required. Ragas v. Argonaut Southwest Insurance Co., 388 So.2d 707 (La.1980), is cited for the proposition that a remand would be required because the record is incomplete due to prejudicial evidentiary rulings by the trial court and the denial of amendments. Ragas is also apparently cited for the proposition that since the weight of the evidence is nearly equal in this case, a firsthand view of witnesses is essential to a fair resolution of conflicting evidence. We disagree. Plaintiff was given the opportunity to make a full proffer of evidence on the issue of vicarious liability and the weight of the evidence is not at all equal but clearly favors the defendants. This court has a duty to review facts, as well as law, and render any judgment that is just, legal, and proper upon the record on appeal. LSA-Const. art. 5 § 10; LSA-C.C.P. art. 2164. Accordingly, we reject this contention.
On April 27, 1982, plaintiff-decedent filed a third amended petition wherein he attempted to reassert the allegations concerning the vicarious liability of defendants for acts of Dr. Miles. For the first time he also specifically alleged that Dr. Miles negligently administered or ordered the administration of Demerol to Mr. Royer when he knew or should have known Mr. Royer was allergic to it, and that Lafayette General was vicariously liable for this act by Dr. Miles (Dr. Miles was still not made a party defendant); that other actions by agents, servants or employees of Lafayette General violated rules of the Joint Commission for the Accreditation of Hospitals and that such violations constituted negligence per se; and that Dr. Palmintier needlessly ordered the arteriogram performed on Mr. Royer and that such act constituted negligence.
At the time the third amended petition was filed, the case was set for trial on June 14, 1982. The proposed amendments were discussed at a pre-trial conference on May 3, 1982. The trial judge denied plaintiff-decedent leave to amend the petition as to all paragraphs alleging the vicarious liability of the defendants for any acts of Dr. Miles. We find it unnecessary to address plaintiff's assertion of error as to the trial court's ruling insofar as it concerns this issue since we have previously discussed and disposed of it in reference to the second amended petition.
The trial judge determined that the issues regarding the violation of accreditation rules by Lafayette General and Dr. Palmintier's ordering of the arteriogram were additional theories of recovery. Defendants argued that they would be prejudiced if required to prepare a defense to meet the new allegations in time to meet *238 the June 14, 1982 trial date. The trial judge gave plaintiff-decedent the option of going to trial on June 14, 1982 under the original petition as previously amended or amending the petition to add the two new theories of recovery in which case the court would grant defendants a continuance. At that time, plaintiff indicated that he was going to apply to this court for supervisory writs regarding the ruling of the trial court.
On May 27, 1982, defendants filed a motion for a continuance reciting that, since plaintiff-decedent intended to apply for supervisory writs, a June 14, 1982 trial would not be possible. Defendants also stated in their motion that plaintiff-decedent planned to file a fourth amended petition before he applied for writs. The trial court granted the continuance. On July 29, 1982, plaintiff-decedent filed a fourth amended petition which essentially set forth all allegations and demands contained in his original, second, and third amended petitions except that Dr. Corne was not named as a defendant. Additionally, for the first time since suit was filed nine years previously, Dr. Miles, the Hamilton Medical Group, the Radiology Clinic of Lafayette, and the Radiology Group of Lafayette General Hospital were named as party defendants. That same day, the trial judge signed an order denying plaintiff-decedent leave to amend by filing either his third or fourth amended petitions. Plaintiff applied for supervisory writs to this court which were denied on October 14, 1982. The Supreme Court denied writs on April 18, 1983.
Plaintiffs do not contend that, nor will we entertain any assertion that, since the trial date had been continued, defendants would not have been prejudiced had the trial court granted plaintiff-decedent leave to amend. The trial judge made his ruling on May 3, 1982 in the face of the June 14, 1982 trial date. Plaintiff-decedent chose not to take either option the court offered and the court issued a judgment denying him leave to amend only after he filed a fourth amended petition. For purposes of this review, we will consider both the third and fourth petitions as filed and ruled on by the trial court as of May 3, 1982. To do otherwise would be to encourage delay tactics and interfere with the orderly calendering by a court of its trial docket.
Plaintiffs present the same argument in support of their contention that the trial court erred in denying plaintiff-decedent leave to file the third and fourth amended petitions as they previously set forth regarding the second amended petition. That is, the liberal allowance of amendments under LSA-C.C.P. art. 1151 as interpreted by the courts in the Giron, supra, and Wallace, supra, decisions.
We are unable to find any abuse of discretion in the trial court's rulings as to the third and fourth amended petitions. Nowhere in plaintiff-decedent's original petition, or even his aborted second amended petition, were defendants apprised of, or put on notice of, demands based on Dr. Palmintier needlessly ordering the arteriogram or the violation of acreditation standards by Lafayette General. The Hamilton Medical Group, the Radiology Clinic of Lafayette, and the Radiology Group of Lafayette General were never placed on notice that they would have to defend against the allegations contained in the fourth amended petition and not asserted until ten years after the incident in question. Plaintiffs do not now, nor did plaintiff-decedent then, provide any justification for failing to raise these issues, or bring in these defendants, until shortly before trial when suit had been filed nine years earlier. Defendants claimed that they would be prejudiced in preparing an adequate defense in time for trial. The trial court, in the exercise of its discretion, gave plaintiff-decedent two options. The granting of a continuance is recognized as a way to avoid prejudice to a defendant, while allowing a plaintiff to amend. See: Wallace, supra; 43 Tul.L. Rev. 211. For these reasons, we find no merit in plaintiffs' contentions of error as to the trial court's rulings regarding plaintiff-decedent's third and fourth amended petitions.

*239 RES IPSA LOQUITUR
Plaintiffs contend the trial court erred in finding that the doctrine of res ipsa loquitur was not applicable to the facts of this case. We disagree.
Under the doctrine of res ipsa loquitur, a defendant's negligence is inferred because, under the facts presented, the inference that defendant's negligence caused plaintiff's harm is probable and more plausible than any explanation propounded. Morgan v. Willis-Knighton Medical Center, 456 So.2d 650 (La.App. 2nd Cir.1984). The doctrine of res ipsa loquitur is appropriate only if the evidence establishes or suggests that the alleged negligence of the defendant excludes every other reasonable hypothesis as to the cause of plaintiff's condition. Guillory v. Buller, 398 So.2d 43 (La.App. 3rd Cir.1981); Helms v. St. Paul Fire and Marine Insurance, 289 So.2d 288 (La.App. 3rd Cir.1974).
In the instant case, Dr. Leslie Guidry, plaintiffs' own witness, explained what, in his opinion, happened to Mr. Royer. Mr. Royer suffered from Leriche Syndrome, which he explained was blockage, due to the accumulation of plaque, of the lower aorta and the beginning of the iliacs, the main arteries supplying blood to the legs. He stated that the disease was present when Mr. Royer entered the hospital and although undetected, the condition had existed for years. He testified that Dr. Palmintier properly ordered the arteriogram after an examination of Mr. Royer revealed evidence of arterial insufficiency manifested by a lack of circulation in his legs. Dr. Guidry explained that the only way to find out the extent to which the arteries are blocked is through an arteriogram.
He opined that during the arteriogram, the catheter used to inject dye into Mr. Royer's arteries dislodged some of the plaque which lined the artery walls. This plaque traveled to a point in Mr. Royer's lower aorta which was significantly narrowed by further accumulation of plaque resulting in a complete blockage of the lower aorta. The blockage stopped the flow of blood to Mr. Royer's legs, causing the stagnant blood to clot all the way down to his toes. Dr. Guidry and Dr. Eugene Kramer, a radiologist, both testified that these complications were known risks of arteriograms which occurred in perhaps two out of every one thousand arteriograms. Dr. Guidry stated that the benefits of an arteriogram outweigh the possible complications.
Dr. Guidry testified that from his examination of the X-rays taken by Dr. Miles, together with Dr. Miles' report, he knew Mr. Royer had a very serious condition and risked losing his legs or becoming completely incapacitated. The gangrene in Mr. Royer's left foot was caused by the loss of circulation which resulted from the clotting. Plaintiffs claim that needed care and surgery were delayed by the negligence of Dr. Palmintier and the nurses and staff of Lafayette General. Mrs. Royer testified that no physician saw her husband from approximately 5:00 P.M., when Mr. Royer returned from radiology, until 7:30 or 7:45 P.M., when Dr. Palmintier came into the room. She claims Dr. Palmintier delayed coming to the hospital but admitted that she would not have known if he was present in another part of the hospital. Dr. Miles stated that he checked on Mr. Royer around 5:30 P.M. and found him to be in discomfort. He then telephoned Dr. Palmintier, who arrived at the hospital at approximately 6:00 P.M. Dr. Palmintier and Dr. Miles discussed Mr. Royer's condition and Dr. Palmintier telephoned Dr. Guidry, who arrived shortly thereafter. Preparations were made and Mr. Royer was taken into surgery between 8:00 and 8:30 P.M. Based on the amount of blood given to Mr. Royer during surgery, Dr. Guidry estimated that the blood was ordered between 6:30 and 7:00 P.M.
Dr. Guidry stated that the renal arteries, which feed blood to the kidneys, were clear as shown by the arteriogram X-rays and were pulsating during the subsequent surgery. Although the renal arteries had not clotted, Dr. Guidry testified that, during surgery, they had to cross clamp that blood vessel. He then stated, "But it was either *240 that or the man would lose both legs entirely and perhaps his life.". Plaintiffs allege that Mr. Royer's kidney problems resulted from a clot which stopped the flow of blood to the kidneys. Dr. Guidry's testimony negates that contention but nowhere in the record is it shown what exactly caused damage to Mr. Royer's kidneys. Plaintiffs also allege that Dr. Albert Corne negligently treated Mr. Royer for his kidney ailment and that his treatment aggravated and worsened Mr. Royer's kidney problems. However, plaintiffs dismissed suit against Dr. Corne. Plaintiffs' only medical expert witnesses at trial, Dr. Guidry and Dr. Kramer, offered no testimony which would indicate that the negligence of Dr. Palmintier or Lafayette General was the probable or most plausible cause of any damage to Mr. Royer's kidneys.
Mrs. Royer and other family members testified that nurses or other hospital staff members, did not respond to their calls for aid when Mr. Royer began experiencing severe pain subsequent to returning from radiology. It is difficult to ascertain whether these allegations are correct or are the result of a misunderstanding. In any case, there is no evidence to show that any such inaction on the part of nurses or hospital staff members caused or contributed in any detrimental way to Mr. Royer's medical condition.
We find the evidence rules out the negligence of Dr. Palmintier or Lafayette General Hospital as the probable or most plausible cause of Mr. Royer's medical complications following the arteriogram. The trial court correctly ruled that the doctrine of res ipsa loquitur was not applicable to the facts of this case.

DIRECTED VERDICT
At the close of plaintiffs' case, defendants filed motions for directed verdicts in their favor which were granted by the trial court. Plaintiffs contend the trial court erred in rendering those directed verdicts.
LSA-C.C.P. art. 1810 authorizes a trial court to grant a directed verdict. The standard by which a trial court determines whether a directed verdict should be granted has been established jurisprudentially. In Campbell v. Mouton, 373 So.2d 237 (La.App. 3rd Cir.1979), this court set forth the applicable standard:
"On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidencenot just that evidence which supports the non-mover's casebut in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury."
That standard has since been used by this court, Theriot v. St. Martin Parish School Board, 434 So.2d 668 (La.App. 3rd Cir. 1983); Guillory v. Buller, 398 So.2d 43 (La.App. 3rd Cir.1981), and has been impliedly approved by the Supreme Court. See: Breithaupt v. Sellers, 390 So.2d 870 (La. 1980).
A plaintiff's burden of proof in a medical malpractice suit is set out in LSA-R.S. 9:2794:
"A. In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq., a dentist licensed under R.S. 37:751 et seq., or a chiropractic physician licensed under R.S. 37:2801 et seq., the plaintiff shall have the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a *241 particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, or chiropractic physicians within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill, and
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred."
Dr. Guidry testified that Dr. Palmintier's assessment of Mr. Royer's condition, his diagnosis, his recommendation, and his calling in of himself (Dr. Guidry) met an acceptable standard of professional skill and care of a physician practicing surgery as Dr. Palmintier does. He stated that Dr. Palmintier's recommendation for the arteriogram was absolutely the proper step to take before varicose vein surgery, but that even if Dr. Palmintier had not ordered varicose vein surgery, an arteriogram would have been the proper thing to do to further evaluate Mr. Royer based upon his symptoms of arterial insufficiency. He further stated that Dr. Palmintier's actions were exemplary.
Dr. Palmintier apparently diagnosed plaintiff as suffering from "early" arterial insufficiency when, according to Dr. Guidry, the condition was longstanding or "coming on". Dr. Guidry stated however, that an arteriogram should have been ordered regardless of whether the diagnosis was early or longstanding arterial insufficiency. Dr. Guidry also testified that, in his opinion, the nursing personnel and hospital staff gave Mr. Royer adequate and proper care and did nothing which caused or contributed to Mr. Royer's medical problems.
Considering all of the evidence presented, together with all reasonable inferences, in a light most favorable to the plaintiffs, we find the facts and inferences point so overwhelmingly in favor of the defendants that reasonable men could not arrive at a verdict other than in favor of the defendants. Accordingly, we find no error in the trial court's action in granting a directed verdict in favor of the defendants, Dr. D.J. Palmintier, Lafayette General Hospital, and their respective insurers.

DECREE
For the reasons assigned, the judgment of the trial court is affirmed. All costs of this appeal are assessed against the plaintiffs-appellants.
AFFIRMED.