| xBOWES, Judge.
Defendant/appellant, Dr. John Dewey, appeals a judgment in favor of plaintiff/appel-lee, Christy Ragas, in the amount of $7,729.21. We reverse.

FACTS

Mrs. Ragas went to Dr. Dewey, a general dentist, to have a wisdom tooth pulled in July, 1992. After anesthetizing plaintiff, Dr. Dewey began to pull the tooth, which rolled and then became lost in the surrounding tissue. Unable to find the tooth after probing the area for some period of time (the actual amount of time is in dispute), Dr. Dewey, on the same day, Referred plaintiff to Dr. Anthony Indovina, an oral surgeon, whose office was only a short distance away, who successfully completed the extraction.
Mrs. Ragas filed suit against Dr. Dewey in the district court for damages for medical malpractice. Specifically, she averred that as a result of the treatment and attempted extraction, she suffered an infection which incapacitated her for four weeks, facial swelling, constant headaches and nausea, and difficulty in breathing and in eating.
Following presentation of the evidence in the trial on the merits, the court found that Dr. Dewey was negligent and that his negligence caused the plaintiff’s damages. Therefore, the court rendered judgment in favor of plaintiff in the amount of $249.21 for medical expenses, and $7,500.00 in general damages. Dr. Dewey appeals.

TRIAL

Plaintiff testified that she got into the dentist’s chair at exactly 10:00 a.m. on the morn *828 ing of July 1, 1992 and was in the chair from a few minutes after ten until approximately 12:45 p.m. According to plaintiff, Dr. Dewey took x-rays and then began the extraction; he worked on the tooth extraction for about an hour without, success. After a brief pause, he began to probe the area again. According to Mrs. Ragas, he told her that the tooth was slipping and turning. After a while, she began to cry as the defendant continued to probe in her mouth. More x-rays were taken, and the attempt to extract the tooth continued. Plaintiff had five or six ^anesthetizing shots altogether, and the procedure went on for two to two and one-half hours, although there is considerable evidence to the effect that not all of this time was spent continuously trying to extract the tooth.
Finally, but on the same day, defendant referred plaintiff to Dr. Anthony Indovina, an oral surgeon. After arriving at Dr. Indo-vina’s office, it took the oral surgeon about 30 or 35 minutes to complete the extraction. Afterwards she states she suffered pain and bruising. She says she was unable to talk for one week and she could not open her mouth to eat or drink, could not brush her hair, or do anything by herself for four weeks. In addition, she had an infection in her mouth. She said she still experiences pain in her face when it rains. On cross-examination, she stated that Dr. Dewey only left the room twice during the entire procedure while attempting to extract her tooth for the entire two and one-half hours. Dr. Dewey, testifying from his written appointment schedule for the day in question hotly disputes this and says a great part of this time was attending to five other patients and letting plaintiff rest.
Although she was in and out of the room where the procedure was being performed, plaintiffs mother corroborated part of her daughter’s version of the incident and her consequent injuries. Plaintiffs sister and husband, who arrived later at Dr. Dewey’s office shortly before she left for Dr. Indovi-na’s office, also corroborated some of plaintiffs sickness and subsequent injuries.
pin qualifying as an expert witness called by the plaintiff, Dr. Indovina testified that his specialty of oral and maxillofacial surgery is the specialty practice associated with surgical extraction of teeth, repair - of multiple facial fracture type injuries, correction of facial deformities, temporomandibular joint surgery and implant type surgery. The oral surgeon essentially limits his practice to extractions, and does no other general dentistry procedures such as crowns and fillings. His dental education was at LSU school of Dentistry, with three years of residency at LSU and (the former) Charity Hospital; he is board certified. He has considerably more training and education than a general dentist, and never practiced as such.
Dr. Indovina felt that the problem presented by Mrs. Ragas was a complication which his training and expertise allowed him to resolve more quickly than a general dentist because of his background in anatomy. However, he expressly stated that he had “no problem” with a general dentist taking out wisdom teeth, and that many such dentists are trained in this procedure and feel comfortable with it and routinely perform these extractions. He confirmed that Mrs. Ragas was referred to him by Dr. Dewey.
Initially Dr. Indovina took an x-ray to determine the location of the tooth. Then it took him 20 to 30 minutes to complete the extraction begun by Dr. Dewey. He opined that during the earlier procedure the tooth became displaced, but he could not describe the actual mechanism which |scaused this to happen. He stated that there are many factors to consider concerning the length of time devoted to removal of a tooth, and that it was not out of the realm of anyone’s general dental practice to take three hours to try and find such a tooth and not be able to do so.
According to Dr. Indovina, a wisdom tooth extraction is just a matter of training and expertise, and because he is more specifically trained to handle the complications, it doesn’t take him as long to complete this kind of extraction. He could not say at what point it occurred, or which procedure, or what, caused plaintiffs infection or bruising. He stated that the residual soreness and scar tissue suffered by Mrs. Ragas, along with the *829 infection, are not unusual complications considering the length of the two procedures.
On cross-examination, Dr. Indovina stated that occasionally a molar may be inadvertently lost in tissue through no particular fault of a dentist, and these extractions may be quite difficult because of poor access and visibility in that area. Even if the procedure in Dr. Dewey’s office had taken only 45 minutes, his opinions with respect to the complications suffered by plaintiff would not change. “It is easier on the patient if I see them sooner, but it doesn’t change anything with respect to the outcome.” He also said that it was appropriate, and the proper thing to do, for the general dentist to refer the case to him once he saw that the tooth had rolled and gone into the tissue space.
16In response to questions from the court, Dr. Indovina stated that the most common problem in these cases is that the dentist does not make a large enough incision, and the secondary procedure (after the tooth becomes lost) requires a significantly larger incision. “That is the reason for the scar tissue and the problems associated with the contraction (sic) when the weather changes occur, to open the space up adequately to find a tooth once it has been displaced.” His records did not reflect whether the incision made by Dr. Dewey was big enough to do the extraction, but after plaintiff was in his care, he necessarily had to make a larger incision to gain access to the tooth after the tooth was lost.
Dr. Dewey testified that he has extracted an average of five to ten third molars (wisdom teeth) per week (a total of 7,500 to 15,000) over the last thirty years. He stated that most dentists in the local area also do this kind of extraction routinely. In the present case, another dentist in his office had taken Mrs. Ragas’s x-ray, which Dr. Dewey reviewed before attempting the extraction. Customarily, if a patient needs to have a molar tooth extracted and it is infected, the dentist gives them antibiotics for five days to a week prior to the extraction. In Mrs. Ragas’s ease, his other dentist, Dr. Barre, gave plaintiff antibiotics to take for several days prior to this extraction.
Dr. Dewey testified that his review of the x-ray disclosed that his appraisal of the situation appeared to be a relatively easy tissue impaction Rand, for that reason, he made a conservative or small incision. This is a smaller incision (than Dr. Indovina made subsequently) which did not involve a tissue flap. He said about 70% of third molar extractions require only this smaller incision. Usually, the tooth is then elevated and rolls out. However, in this case, the tooth rolled back instead of rolling out. He said that this is not too uncommon and therefore he continued with the procedure to locate and extract the molar.
At first, Dr. Dewey tried to right the tooth and take it out. However, in attempting to do that, the tooth eventually rolled into the tissue space. He testified that this is the first time a tooth has rolled into the tissue space in his thirty years of practice. At that point Dr. Dewey did not attempt any further work on the procedure. He estimated that he actually worked on the procedure from 45 minutes to an hour, leaving the room several times to allow the shots to take effect and to see other patients. While Mrs. Ragas may have been in the office for two and one-half hours, he strongly maintained that he worked on her for only the 45 minute period. Consulting his appointment book for corroboration, Dr. Dewey testified that he saw five other patients during that same period between 10:30 to 12:00. He further testified as to his standard sterilization procedures relative to instruments, gloves, etc.
According to Dr. Dewey, it is very possible that Mrs. Ragas was already suffering from an infection (even though he took the precaution ofjgusing antibiotics for five days prior to beginning the procedure) by the time he treated her. In addition, he said that even using the best dental standards available, infection is always a possibility.
On cross-examination, Dr. Dewey stated that he felt Dr. Indovina made a larger incision because he was going after and trying to locate the tooth which had now become lost in the tissue space, while he (Dr. Dewey) was performing what he thought, from reviewing the x-ray, would be a relatively simple procedure without complications.
*830 Dr. Darren Cox, a dentist who works in defendant’s office, testified for the defense via deposition. He stated that the conservative approach to extracting teeth is more desirable than a more extensive procedure, or larger incision. The extent of the impaction and the position of the tooth help to determine the size of the necessary incision. He also agreed with Dr. Indovina and testified that it was very common for dentists in this area to extract routinely, third molar (wisdom) teeth. He understood that Dr. In-dovina made a larger incision than had Dr. Dewey had because the tooth had already rolled and become otherwise inaccessible in the tissue.
In its reasons for judgment, the trial court found that Dr. Dewey had probed for two and one-half hours and could not find the tooth, then referred plaintiff to Dr. Indovina. The court further stated as follows:
In his report and at trial, Dr. Indovina stated that Ragas’ tooth was displaced as the result of the attempted extraction by Dewey. Dr. Indovina further stated that the most common cause of this | gtype of accident is the dentist’s failure to make an incision large enough to extract the tooth.
The court went on to find that plaintiff had carried her burden of proof, without defining what that burden consisted of, and that Dr. Dewey failed to use proper procedures to remove the tooth, and that such failure caused the damages suffered by Mrs. Ragas.

ASSIGNMENTS OF ERROR

Defendant urges that the trial court committed error in allowing an oral surgeon to testify about community standards for general dentists, and also in finding that he committed malpractice by violating any community standard of his profession.

ANALYSIS

The burden of proof in a malpractice case is outlined in La.R.S. 9:2794:
See. 2794. Physicians, dentists, and chiropractic physicians; malpractice; burden of proof; jury charge
A.In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq., a dentist licensed under R.S. 37:751 et seq., or a chiropractic physician licensed under R.S. 37:2801 et seq., the plaintiff shall have the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the lipdefendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, or chiropractic physicians within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
B. Any party to the action will have the right to subpoena any physician, dentist or chiropractic physician for a deposition and/or testimony for trial to establish the degree of knowledge or skill possessed or degree of care ordinarily exercised as described above without obtaining the consent of the physician, dentist or chiropractic physician who is going to be subpoenaed. The fee of the physician, dentist or chiropractic physician called for deposition and/or testimony under this Section will be set by the court.
C. In medical malpractice actions the jury shall be instructed that the plaintiff has the burden of proving, by a preponderance of the evidence, the negligence of the physician, dentist or chiropractic physician. The jury shall be further instructed that injury alone does not raise a presumption of the physician’s, dentist’s or chiropractic physician’s negligence. The provisions of *831 this Section shall not apply to situations where the doctrine of res ipsa loquitur is found by the court to be applicable.
With reference to defendant’s complaint that Dr. Indovina, an oral surgeon, should not have been permitted to testify as to community | nstandards of a general dentist, our Supreme Court has held in McLean v. Hunter, 495 So.2d 1298 (La.1986) that a periodontist was qualified to testify relative to the standards of a general dentist. In so holding, the court said:
We now hold it is a specialist’s knowledge of the requisite subject matter, rather than the specialty or sub-specialty within which the specialist practices, which determines whether a specialist may testify as to the degree of care which should be exercised by general practitioners. A particular specialist’s knowledge of the subject matter on which he is to offer expert testimony should be determined on a ease by case basis.
Implicit support for our holding is provided by La.R.S. 9:2794(B), which provides that a party to a malpractice suit has “the right to subpoena any ... dentist ... for trial to establish the ... degree of care ordinarily exercised.” A periodontist such as Dr. Lovelace is obviously no less a dentist because he engages in a specialty practice rather than a general dentistry practice.
The Supreme Court then cited a California case, with whose language the court agreed, as follows:
To qualify a witness as a medical expert, it must be shown that the witness (1) has the required professional knowledge, learning and skill of the subject under inquiry sufficient to qualify him to speak with authority on the subject; and (2) is familiar with the standard required of a physician under similar circumstances; where a witness has disclosed sufficient knowledge of the subject to entitle his opinion to go to the jury, the question of the degree of his knowledge goes more to the weight of the evidence than to its admissibility.
li2Nor is it critical whether a medical expert is a general practitioner or a specialist so long as he exhibits knowledge of the subject. Where a duly licensed and practicing physician has gained knowledge of the standard of care applicable to a specialty in which he is not directly engaged but as to which he has an opinion based on education, experience, observation or association with that specialty, his opinion is competent. The reason for not requiring specialization in a certain field is obvious. Physicians are reluctant to testify against each other. Consequently, when an expert can be found, it is immaterial whether he is a general practitioner or a specialist providing he has knowledge of the standard of care in any given field; otherwise, the plaintiff could never prove a case against a specialist unless he had an expert of the particular specialty, and the plaintiff would never be able to sue a general practitioner unless he had a general practitioner who was willing to testify as an expert. Evans [v. Ohanesian, 39 Cal. App.3d 121], 112 Cal.Rptr. [236], 240, 241 [(4 Dist.1974)] (citations omitted).
Then the court (in the above quoted cases) addressed the qualifications of the periodontist witness, finding him qualified to testify as to the standard of care expected of general dentists practicing in Baton Rouge, the area in which this case took place. The court in the above case then found it relevant that the witness graduated from LSU School of Dentistry; was licensed to practice general dentistry in Louisiana; was a part time teacher of periodontics at the dental school; that 80% of his practice consisted of referrals from general dentists; that he worked in conjunction with general dentists concerning particular cases; and that he specifically testified he is familiar with general dentistry in his community, and with the appropriate standard of care and skill and knowledge of the general dentists in that area. | ;gThe court concluded that the periodontist was amply qualified to testify concerning the standard of periodontal care required of general dentists. In this regard see also Vila v. Faget, 598 So.2d 388 (La.App. 4 Cir.1992).
In the case before us, Dr. Indovina is also a graduate of LSU School of Dentistry and a part-time faculty member of that institution *832 and most of his patients are referred by dentists.
Moreover, he, Dr. Dewey, and Dr. Cox agreed that the procedure performed actually was oral surgery, the area of Dr. Indovi-na’s expertise. Accordingly, we find no compelling reason to distinguish the standard of care required of a general dentist from that of an oral surgeon when the matter in question is oral surgery. The latter has more experience and specific training than the former in the specific subject at hand. We find that Dr. Indovina has amply demonstrated the requisite knowledge of the subject matter of oral surgery to testify.

STANDARD OF PROOF

In Martin v. East Jefferson General Hosp., 582 So.2d 1272 (La.1991), the Louisiana Supreme Court succinctly set forth the standard of proof required to prove malpractice, as follows:
In a medical malpractice action against a physician, the plaintiff carries a two-fold burden of proof. The plaintiff must first establish by a preponderance of the evidence that the doctor’s treatment fell below the ordinary standard of care expected of physicians in his medical specialty, and must then establish a causal relationship between the alleged negligent treatment and the injury sustained. LSA-R.S. 1149:2794; Smith v. State through DHHR, 523 So.2d 815, 819 (La.1988); Hastings v. Baton Rouge General Hospital, 498 So.2d 713, 723 (La.1986). Resolution of each of these inquires are determinations of fact which should not be reversed on appeal absent manifest error. Housley v. Cerise, 579 So.2d 973 (La., 1991); Smith, 523 So.2d at 822; Rosell v. ESCO, 549 So.2d 840 (La.1989); Hastings, 498 So.2d at 720. [Emphasis supplied],
We have searched the record in vain for any evidence whatsoever, whether it be expert testimony or otherwise, that the treats ment given by Dr. Dewey fell below the proper or “ordinary standard of care expected of physicians in his medical speciality.” In point of fact, there was no specific testimony on the appropriate standard of care whatsoever. Dr. Indovina certainly did not testify that Dr. Dewey was negligent, nor that his treatment was substandard. Dr. Indovina did not state that the tooth was misplaced or lost because the incision made by Dr. Dewey was too small. In fact he testified that his records did not reflect whether the incision made by Dr. Dewey was big enough to do this extraction. He merely said “the most common cause of this type of accident is the dentists’s failure to make an incision large enough to extract the tooth.” Unfortunately, it appears from the brief reasons for judgment that the trial judge latched on to this one general statement as his entire basis for his finding of malpractice on the part of Dr. Dewey.
lisNor do we find anything in the testimony of either the defendant himself, or of Dr. Cox, which might have led the trial court to conclude that it was negligence or malpractice for the defendant to have made a “conservative” incision. This is especially true because of Dr. Dewey’s study of the x-ray taken by him before he began the procedure which led him to believe that it would be a simple procedure with no complications. Such caution on his part certainly does not indicate negligence in making a small incision which is much less painful to the patient and heals much better and faster.
Our Supreme Court has recently stated in Pfiffner v. Correa, M.D., 94-0924 (La. 10/17/94), 643 So.2d 1228:
We hold that expert testimony is not always necessary in order for a plaintiff to meet his burden of proof in establishing a medical malpractice claim. Though in most cases, because of the complex medical and factual issues involved, a plaintiff will likely fail to sustain his burden of proving his claim under LSA-R.S. 9:279Jp’s requirements without medical experts, there are instances in which the medical and factual issues are such that a lay jury can perceive negligence in the charged physician’s conduct as well as any expert can, or in which the defendant/physician testifies as to the standard of care and there is objective evidence, including the testimony of the defendant/physician, which demonstrates a breach thereof. *833 Even so, the 'plaintiff must also demonstrate by a preponderance of the evidence a causal nexus between the defendant’s fault and the injury alleged.
[Emphasis supplied].
|i6In the present case, there is no evidence whatsoever that the smaller incision made by Dr. Dewey was a breach of the standard of care required by dentists. Dr. Indovina did not state, nor can we interpret his testimony to mean, that the ordinary or appropriate standard of care required by general dentists in extraction of molars was to make a larger incision, in all eases, than that made by defendant. In addition, we find nothing in the record to support the perception of the lay person, or the trial judge, that negligence occurred. Dr. Indovina was not asked nor queried on the ordinary or proper standard of case to be used in this case — NOR how, if at all, that standard was breached by Dr. Dewey. However, Dr. Indovina did testify that molars will sometimes roll and become lost through no fault of the dentist and that even a dentist or oral surgeon operating reasonably and prudently may still inadvertently lose the tooth in the tissue as occurred in this ease. This testimony, far from condemning Dr. Dewey for his standard of care seems to completely exonerate him.
In Gurdin v. Dongieux, 468 So.2d 1241 (La.App. 4 Cir.1985), the court found as follows:
In determining whether a defendant possessed the requisite degree of knowledge or skill or whether he exercised reasonable care and diligence, the court is guided by expert witnesses who are members of defendant’s profession and who are qualified to testify. Steinbach v. Barfield, 428 So.2d 915 (La.App. 1st Cir.1983); Wiley v. Karam, supra [421 So.2d 294 (La. App. 1st Cir.1982) ]; Guillory v. Buller, 398 So.2d 43 (La.App. 3rd Cir.1981).
1 i7Three dentists testified that defendant’s treatment was unsuccessful, but none said it was negligent or fell below the standard ordinarily exercised by orthodontists.
* * * * ⅜ * .... the best that was said for plaintiff is her treatment was unsuccessful. Unsuccessful treatment is not per se an indication of malpractice. Chaney v. State through Department of Health and Human Resources, 432 So.2d 256 (La.1983); Gunter v. Plauche, 439 So.2d 437 (La.1983).
In the absence of any testimony that defendant lacked the degree of knowledge or skill ordinarily practiced by orthodontists, or he failed to use reasonable care and diligence, we must conclude' the trial judge properly granted a directed verdict as to the malpractice action.
In the case before us, the trial judge did not even make a finding of what the ordinary or appropriate standard of care is in the community nor did he even state or conclude that Dr. Dewey’s actions or conduct fell below this standard. He merely made a vague finding that Dr. Dewey “failed to use the proper procedure” and that this failure caused plaintiffs damages. Thus, we hold that the trial judge actually and factually did not make a proper finding of malpractice on Dr. Dewey’s part.
Furthermore, we find that the plaintiff did not carry her burden of proving causation.
To recover for medical malpractice, a plaintiff must prove not only that the applicable standard of care was breached, but also that the doctor’s substandard conduct caused an injury_ that the ¡^plaintiff would not otherwise have suffered. LSA-R.S. 9:2794.
[Emphasis supplied].
Byrd v. State Through Dept. of Public Safety and Corrections, 93-2765 (La. 5/23/94), 637 So.2d 114.
In addition in Cangelosi v. Our Lady of the Lake Regional Medical Center, 564 So.2d 654 (La.1989), the court held:
That is, he must show by a preponderance of the evidence, or more probably than not, that he suffered the injury because of defendant’s conduct.
Dr. Indovina could not state at what point or in which procedure plaintiff developed the infection, nor could any of the doctors. We note that plaintiff was given antibiotics prior *834 to her surgery, which, according to the testimony, indicates that infection was already present before the surgery.
As for the remaining injuries, Dr. Indovina testified that there was no way to determine which procedure caused the bruising and he also said that it is not unusual for patients to have some problems when they have extensive procedures — the swelling (which usually follows extraction) and inability to open the mouth significantly alters the diet, contributing to the weakness and dizziness complained of. He further stated that scarring, caused by these procedures, causes changes in tissue contraction (numbness) and that he could not state that the plaintiffs sinus complaints were caused by the surgery.
h9In summary, even assuming the plaintiff had proven that Dr. Dewey’s treatment fell below the appropriate standard of care (which we do not find), Mrs. Ragas did not carry her burden of proving that such treatment caused injuries to her that would not otherwise have occurred, a finding which is mandated and required by La.R.S. 9:2794(A)(3), supra. Nor did she prove more probably than not, that any negligent conduct of the defendant caused her to suffer the pain and suffering which she undoubtedly did suffer. We do not doubt that Mrs. Ragas testified truthfully concerning her injuries and sufferings and we deeply sympathize with her. However, like an unavoidable accident, blame is not always assignable to a particular person or thing for the occurrence.
We are acutely aware of the frequent pronouncements of the Supreme Court regarding the vast discretion of the trial judge in findings of fact and that they should not be disturbed unless they do not represent a permissible view of the evidence and are clearly wrong or manifestly erroneous. Martin, supra; Stobart v. State Through Dept. of Transportation and Development, 617 So.2d 880 (La.1993).
However, in this case, because of our detailed reasons above, and the failure of the trial judge to make a finding of the ordinary or appropriate standard of care in like eases or to show or conclude how it was breached by Dr. Dewey, and in view of the almost complete lack of evidence which would allow such a conclusion — and further in view of the overwhelming ^testimony and evidence to the contrary — we are forced to conclude that the trial judge abused his vast discretion and the conclusions reached by him are clearly wrong or manifestly erroneous.

DECREE

For the foregoing reasons, the judgment of the trial court in favor of plaintiff in the amount of $7,729.21 is reversed and judgment is now rendered in favor of the defendants, Dr. Dewey, finding him not guilty of malpractice, and his insurer, and against the plaintiff dismissing her suit. Costs of this appeal are taxed to appellant.
REVERSED.
GAUDIN and DUFRESNE, JJ., dissent with reasons.
WICKER, J., concurs with reasons.